EVERS, J. T. C.
This local property tax matter involves cross-appeals from the judgment of the Bergen County Board of Taxation which reduced the assessment on plaintiff’s property for the 1978 tax year. In addition to claiming that the county board judgment exceeds the true value, plaintiff alleges discrimination in the assessment. During the trial plaintiff moved to prohibit the defendant from submitting any affirmative evidence in support of its appeal.
The assessments and county board judgment reflect the following:
Block 153, Lot 1 Block 133, Lot 11-20
Assessment County Board Assessment County Board
Land $ 47,500 $ 47,500 $ 38,000 $ 38,000
Improvements 253,200 137,500 219.500 150.000
Total $300,700 $185,000 $257,500 $188,000
Although the property consisted of separate tax blocks and lots, it was used as one economic unit in connection with plaintiff’s operation of a 42-unit, 30-year-old garden apartment *209 complex.[1] Twenty garages and some limited on-site parking were provided. The structure was described as being in fair condition. The complex is located in a neighborhood which contains many similar garden-type apartment developments. All tenants occupy the premises on a month-to-month basis, there being no written leases. Tenants pay for gas and electricity, while heat and hot water are provided by plaintiff landlord. Each apartment is furnished with a refrigerator and stove. The rents are subject to defendant borough’s rent control ordinance, which limited increases to 5% annually. The ordinance permitted applications for additional increases. Defendant claims that due to plaintiff’s failure to properly pursue such a course, it is barred from tax relief on the theory that plaintiff has failed to exhaust its administrative remedies. The property was acquired by plaintiff on January 25, 1978 for $400,000 in an all-cash transaction.
Concerning plaintiff’s motion, I first note that a pretrial order was entered in June 1980 which, among other provisions, required that expert appraisal reports be exchanged no later than August 16, 1980. That exchange date presumed a trial date in October 1980, as required by the pretrial order. For various reasons, and primarily at the request of defendant’s attorney, the trial was adjourned on several occasions.[2]
R. 8:6 — 1(b)(1) provides:
A party intending to rely upon the testimony of any person testifying as an evaluation expert shall furnish each opposing party with a copy of the written appraisal report of the expert as follows: (i) in cases where a pretrial conference is held, at a time and in the manner affixed by the court, but no later than ten days prior to the first date fixed for trial....
Recognizing that defendant’s requests for adjournments and failure to abide by the pretrial order were caused in part by *210 illness and infirmities of defendant’s counsel, both the court and plaintiff’s counsel accommodated defendant borough in agreeing to carry this matter. However, defendant never reciprocated. When numerous inquiries by the court and plaintiff’s counsel as to the status of defendant’s appraisal report failed to produce either the report or an acceptable excuse for such failure, the matter was scheduled for trial on May 4, 1981. Defendant obtained substitute counsel who sincerely attempted to rectify the matter. Defendant’s appraisal report was served just prior to the commencement of the trial.
R. 8:6 — 1(b)(1) was specifically promulgated to bring to an end the practice (often engaged in in the Division of Tax Appeals) of surprising an adversary and insulting the dignity of the tribunal by virtue of an eleventh hour service of what is often a most important exhibit in a real property valuation case. This rule is clearly mandatory and is routinely honored in the context of the pretrial conference. In some instances special circumstances may require an extension of the time limit. But where, as here, in spite of extensions, such repeated dilatory tactics disrupt proper trial preparation and obstruct the function of the court, the judge has no alternative but to disallow affirmative proofs by the offending party. Accordingly, plaintiff’s motion was granted.
The testimony of plaintiff’s witness was clear, credible and fully supportive of his opinion of value. The subject property is a property typically bought and sold on the basis of a return on investment and therefore primary reliance was placed on the income approach to value by the taxpayer. The borough’s case, of course, assumed this approach to be most appropriate in view of its rent control theory. See, generally, Middlesex Builders, Inc. v. Old Bridge, 1 N.J.Tax 305 (Tax Court 1980), and Parsippany Hills Associates, Inc. v. Parsippany-Troy Hills, 1 N.J.Tax 120 (Tax Court 1980).
The effective net income in the amount of $98,134 was derived by deducting 2% for vacancy and credit losses from the actual gross income of $99,624 and adding thereto $500 for laundry *211 commissions. The actual and stabilized expenses, which include a reserve for replacement of the kitchen appliances, amounted to $43,783, or approximately 45% of the income. While a “rule of thumb” might suggest this ratio of expenses to income to be high, considering the age of the structure, the nature of the tenancies and the effect of rent control on income I find the ratio is not unreasonable. To be capitalized, therefore, is a net operating income of $54,351. However, in order to derive a proper capitalization rate, an effective tax rate must first be found by virtue of discrimination having been made an issue.
The provisions of N.J.S.A. 54:2-40.4 and N.J.S.A. 54:3-22(c) to (f) (collectively known as chapter 123) first became effective in cases of alleged discrimination in assessments for the 1978 tax year. Prior to the advent of chapter 123 a party was often hard-pressed to prove its claim of discrimination. The elements of such proofs were succinctly set forth in Continental Paper Co. v. Ridgefield Part, 122 N.J.Super. 446, 300 A.2d 850 (App.Div. 1973).
In order to make out a case of actionable discrimination, these elements must be proved: (1) that the real property generally in the municipality was assessed at less than true value; (2) what the common assessment level was and (3) the true value of the subject property upon which the common level percentage would operate. Reading Co. v. Woodbridge Township, 45 N.J. 407, 426 [212 A.2d 649] (1965); Matawan v. Tree Haven Apartments, Inc., supra, 108 N.J.Super. [111] at 116 [260 A.2d 235]; Feder v. Passaic, 105 N.J.Super. 157, 160 [251 A.2d 457] (App.Div.1969). If there is no common level shown and there is none which the assessor is endeavoring to apply, and the assessment is substantially higher than the “average ratio” determined by the Director of Taxation, the “average ratio” may be applied under [in re Appeals of] Kents [2124 Atlantic Ave. Inc., 34 N.J. 21, 166 A.2d 763 (1961)], and the assessment reduced by that proportion. Matawan v. Tree Haven Apartments, Inc., supra, 108 N.J.Super. at 116 [260 A.2d 235]; Feder v. City of Passaic, supra, 105 N.J.Super. at 166 [251 A.2d 457]. [122 N.J.Super. at 450-451, 300 A.2d 850.]
In Devonshire Develop. Associates, Inc. v. Hackensack, 2 N.J.Tax 372 (Tax Court 1981), it was stated:
Chapter 123 effectively relieves a party from proving the first and second elements in the above equation. In a pre-Chapter 123 discrimination action a party labored to prove these elements by extensive statistical studies introduced through experts. See R. M. P. Holding Co. v. Passaic, 1 N.J.Tax 359, 367-371 (Tax Ct. 1980), and Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 403-407 (Tax Ct. 1980). Chapter 123 supplies a bypass as to those elements that have been developed by the courts through the years, [at 399]
*212 The essence of chapter 123 is found in two separate provisions which govern such causes of action on the county board and Tax Court levels.
N.J.S.A. 54:3-22 pertains to actions at the county board level and provides in pertinent part:
c. Whenever the County Board of Taxation is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall revise the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
d. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the county board of taxation shall reduce the taxable value of the property by applying the average ratio to the true value of the property.
e. If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level, the county board of taxation shall revise the taxable value of the property by applying the county percentage level to the true value of the property.
f. The provisions of this section shall not apply to any appeal from an assessment of real property taken with respect to the tax year in which the taxing district shall have completed and put into operation a district wide revaluation program approved by the Director of Taxation pursuant to Chapter 424, Laws of 1971 (C. 54:1-35.35 et seq.)
N.J.S.A. 54:2-40.4 pertains to Tax Court actions and is essentially identical to the county board provisions. The only appreciable difference is that N.J.S.A. 54:2-40.4 states that chapter 123 relief is not appropriate where “a reassessment program approved by the county board of taxation,” in addition to cases where a district-wide revaluation, has taken place.
The core of chapter 123 is found in N.J.S.A. 54:l-35a and N.J.S.A. 54:l-35b which establishes the statistical formula for an action grounded in discrimination. These sections define the key terms “average ratio” as “that ratio promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1-35.1 et seq. as of October 1st of the year preceding the tax year,” and the “common level range” as “that range which is *213 plus or minus 15% of the average ratio for that district”.[3] The Director of the Division of Taxation is directed, on or before April 1 in each year, to determine the average ratio and common level range.
Thus, although the Legislature has declared that the assessment year (pre-tax year) school aid ratio shall be used, it was stated in Devonshire, supra:
However it must be emphasized that the Legislature, in enacting Chapter 123, preserved the right of a party to rebut the presumption that the pre-tax year school aid ratio reflects the common level in the taxing district. In short, without more, the Chapter 123 remedy, in the first instance, will be employed in determining the validity of discrimination claims .... the presumption of discrimination in accordance with the Chapter 123 ratio can be rebutted by a party in any manner demonstrating a common level notwithstanding the Chapter 123 ratio. [At 404 and 405]
Thus, after alleging discrimination and proving a true value different from the original assessment, a party may now simply rest on the presumption established by chapter 123 or it may affirmatively attempt to prove a common level notwithstanding the chapter 123 presumption of a common level. The taxpayer chose to attempt to demonstrate that it was entitled to “ratio relief” in accordance with the tax year unweighted, unclassified ratio for 1978. It thus had to rebut the resumption of the applicability of the chapter 123 ratio by demonstrating by a fair preponderance that the ratio derived according to its ^tudy represented the common level of assessments within the borough. The proof of this common level must take the shape of ratio studies adduced in the spirit of the Kents case, 34 N.J. 21, 166 A.2d 763 (1961). It is not bound by any particular ratio study, but the study offered must be probative of the assessing practices within the district. If a party cannot sustain the burden, or if it proves the utter absence of a common level, it still is entitled to the application of the chapter 123 ratio. In either case, the chapter 123 ratio is presumed to be the common level.
*214 The taxpayer employed the Director’s study based on the sales covering July 1, 1977 to June 30, 1978. it derived a common level assessment of 37.99% with a coefficient of deviation of 12.58%.[4] The ratio clusters indicated that 87% of the percentage of assessments to true value of all useable sales were focused in on a 30% to 50% level, and 61% of the percentage of assessments were focused on the 30%-40% range. Of the approximate 3,500 line items there were 147 useable transactions. The taxpayer’s study was based on approximately 4% of the line items in the borough.
According to the taxpayer’s own study, the 1978 chapter 123 ratio (the 1977 unweighted, unclassified ratio) was 43% (42.30% rounded).[5] This ratio was calculated from 115 useable transactions (approximately 3% of the line items) from a sampling period of July 1, 1976 to June 30, 1977, and had a coefficient of deviation of 11.18%, 1.4% less than the 1978 unweighted, unclassified ratio. The ratio clusters for this year indicated that the percentage of assessment to true value for useable sales focused again on the 30% to 50% range; 52% of those in the 40% to 50% range. This statistic obviously explains why the 1978 chapter *215 123 ratio is slightly higher than the 1978 unweighted, unclassified ratio.
Because of the insufficiency of sales data, and in the interest of stability in assessments, I hold that the chapter 123 ratio is applicable. The whole thrust of chapter 123 is to allow assessors to be guided by a ratio that is available as of the assessment date — October 1 of the pre-tax year. Since the chapter 123 ratio is a pre-tax year ratio rounded to the next higher whole number and is promulgated as of April of the tax year, it is readily available to the assessor. The principle of stability of assessments was also at the heart of the 1979 amendment to chapter 123 that changed the chapter 123 ratio to the average weighted and classified ratio, thus transforming it into the pre-tax year school aid ratio. See Devonshire, supra at 402-403.
This matter is unique in that, although the 1978 unweighted, unclassified ratio is derived from more useable sales than the chapter 123 ratio, it has a slightly higher coefficient of deviation pertaining to a more current sampling period. To allow a taxpayer a further reduction by virtue of statistical wizardy would do violence to the critical proposition long ago stated and restated that “mathematical perfection in taxation is unobtainable.” In re Appeal of Kents, supra. At this juncture in the litigation we are dealing not with the per se vindication of constitutional rights but of the measure of relief warranted in guaranteeing those constitutional rights, i. e., that a taxpayer shall not pay more than its fair share of the burden of taxation. In short, the taxpayer herein would be granted a preference by virtue of statistical pyrotechnics. As was stated in Siegal v. Newark, 38 N.J. 57, 183 A.2d 21 (1962):
The thesis is that the taxpayer is injured by so much of the tax bill as exceeds his pro rata share of the burden of local government. True, there may remain some residual harm in that the dollar value of the reduction may be recaptured in another year from all properties including that of the successful appellant. But perfect relief is inherently impossible. If the taxpayer pays no more than his fair share for the year in question, practical justice is achieved. Surely, if the taxpayer who appeals is permitted to pay less than his fair share, the injustice to those who were over-assessed but did not complain would be compounded, [at 61, 183 A.2d 21, emphasis supplied]
*216 As was stated previously, the thrust of chapter 123 is to alleviate the statistical sleight-of-hand inherent in pre-chapter 123 discrimination claims. See Devonshire Develop. Associates v. Hackensack, supra; Diament v. Fort Lee, 3 N.J.Tax 70 (Tax Court 1981). Chapter 123 attempts to fortify the fundamental, cardinal principle of taxation — stability of assessments. Accordingly, unless it is shown by a fair preponderance of the evidence that the application of a chapter 123 ratio in cases of constitutional discrimination would have a virtual confiscatory effect, it will be applied as the measure of relief warranted in order to vindicate the constitutional right to commensurate treatment in local property taxation. To hold otherwise would do violence to the underlying purpose of chapter 123.
Consequently, in view of the virtual state of equipoise herein, I defer to the principle of stability of assessments and will apply the chapter 123 ratio in order to derive the effective tax rate and reduce the assessment to the common level.
In establishing a capitalization rate I accept as fair and reasonable plaintiff’s expert’s use of a 9% return on investment, which is based on a study of alternative investments and mortgage interest rates during the period in question. I also accept a 3% recapture (of investment) rate based on a remaining 33-year economic life of this project. The effective tax rate, found by applying the 43% ratio to the actual rate of $5.61, is 2.41. The total capitalization rate is 14.41%.
There was no evidence adduced concerning the land value and therefore the presumption of correctness adheres. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 89 A.2d 385 (1952). The county board affirmed the land assessment of $85,500, which represents 43% of its true value. Accordingly, I find the true value of the land to be $198,800 (rounded).
The net operating income of $54,351 will be capitalized using the straight capitalization method, with a building residual and straight-line recapture technique as follows.
*217 Net operating income $54,351
Income to land:
$198,800 x 11.41 22.683
Income available to improvements $31,668
$31,668 -s- 14.41 = improvement value 219,764
Add land value 198,800
Value of land and improvements $418,564
The ratio of the original assessed value of $558,200 to the court’s finding of true value of $418,564 is 133%. For the year 1978 the chapter 123 common level range was 37% 50% based on the 43% ratio. Consequently, plaintiff is entitled to ratio relief pursuant to chapter 123. The true value must be reduced pursuant to N.J.S.A. 54:2-40.4(b) to $180,000 (rounded).[6]
In arriving at this conclusion I am not unmindful of defendant’s claim based on the alleged failure of plaintiff to exhaust its administrative remedies. The borough attempted to establish that the capitalized present value of the subject should not be derived from the net operating income based on actual rents, but should be calculated from the potential economic rent composed of the actual rent plus an appropriate hardship increase. At the heart of the borough’s theory was the unarticulated proposition that an investor, as of the assessment date for the year in question, would take into account the potential rent income, inclusive of a hardship increase, and not merely the actual rent called for under artificial market conditions by virtue of rent control/stabilization in arriving at a purchase price. Thus, according to the borough, the taxpayer should be precluded from relief herein since it “failed to exhaust its administrative remedies” because it allegedly did not pursue a hardship increase as vigorously as it should.[7] This inartful *218 expression can only be taken to mean that the taxpayer shirked the burden of a potential increase in net operating income which would increase the capitalized present value of the subject.
The affirmative defense of failure to exhaust administrative remedies has no place in the instant matter since the administrative body allegedly neglected is collateral to proceedings for the reduction of property taxes. The doctrine of exhaustion of administrative remedies presumes that the allegedly neglected administrative body is the appropriate tribunal for the relief sought according to the applicable law. In this State the proceedings for contesting property taxes is commenced in either the county tax board or the Tax Court. Rent control boards have no part in the scheme of property tax appeals.
The full answer to the borough’s theory must be addressed in the context of economic rent as it affects net operating income.
The leading case concerning the issue of economic rent is Parkview Village Associates v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972) where it was stated:
It is of course settled that gross rental income for purposes of applying the capitalized income approach to valuation of property is to be taken at “fair rental value”, professionally termed “economic” rent or income, if that differs from actual rental. New Brunswick v. State of New Jersey Division of Tax Appeals, supra (39 N.J. at [537] 544 [189 A.2d 702]); American Institute of Real Estate Appraisers, The Appraisal of Real Estate (1967), p. 227 et seq.; International Association of Assessing Officers, Assessing and The Appraisal Process (4 ed. 1972), pp. 82, 172; Kahn, Case, Schimmel, Real Estate Appraisal and Investment (1963), p. 103 et seq.; Ring, The Valuation of Real Estate (1970), p. 208. However, actual income is a significant probative factor in the inquiry as to economic income. See McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 243 [214 A.2d 526] (App.Div.1965): Somers v. City of Meriden, 119 Conn. 5, 174 A. 184, 186 (Sup.Ct.1934); People ex rel. Gale v. Tax Commission of City of New York, 17 A.D.2d 225, 233 N.Y.2d 501, 506-507 (App.Div.1962), motion for leave to appeal denied, 12 N.Y.2d 646, 238 N.Y.S.2d 1026 (Ct.App.1963); Assessing and the Appraisal Process, supra, at 82; Real Property Appraisal Manual for New Jersey Assessors (2 ed. 1963), p. 148.
Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area, [at 29-30, 297 A.2d 842]
■ The court then set forth a principle of law particularly appropriate to the instant matter:
*219 In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as is customary with leases or relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. That approach, we believe, conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. New Brunswick v. State of New Jersey Division of Tax Appeals, supra (39 N.J. at 541 [189 A.2d 702]); Switz v. Middletown Township, 23 N.J. 580, 596 [130 A.2d 15] (1957); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163 [65 A.2d 828] (1949). Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fair rental value. See New Brunswick, supra (39 N.J. at 544 [189 A.2d 702]). [Id. at 34-35, 297 A.2d 842]
When a taxing district imposes rent control or rent stabilization on rental property therein, it is quite clear that the income stream, in terms of its actual rents, is artificially capped. Moreover, the taxing district, through market regulations, establishes the economic rent in that district. Consequently, in deriving the present worth for property tax purposes, the true value of rental properties therein is decreased in vis-a-vis the present worth of a property subject to the free market. See Helmsley v. Fort Lee, 78 N.J. 200, 214, 394 A.2d 65 (1978), cert. den. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). It is clear that under a regulated market the present worth of rentals is depressed and, at least theoretically, the burden of the property tax is shifted to other properties not regulated under that taxing district’s rent control ordinance. This shift is due to either the discriminatory effect on the respective assessments of such properties and/or a decrease in the net operating income that translates into a lesser present value by virtue of the capitalization process.
The long and short of the rent control factor is that despite some degree of correlation in terms of determining value, value for purposes of rent stabilization works adversely vis-a-vis value for property tax and investment purposes. It significantly affects the tax base because it disrupts the delicate relationship between various free market factors that are not solely related to the economics of the respective taxing districts. See 36 The Appraiser (American Institute of Real Estate Appraisers), 1, n. 9 (November 1980).
*220 The borough’s position, in view of the foregoing, is quite untenable because the presence of a hardship provision is inconsequential to the determination of economic rent. The unfortunate history of reluctant resort to rent control boards indicates in limine that this tenuous “remedy” would never be considered by an investor in fixing a value of an investment property. As was said by then Chief Justice Weintraub in New Brunswick v. Tax Appeals Div. 39 N.J. 537, 189 A.2d 702 (1963):
A valuation, although based upon a forecast of earnings, must be found upon what is known and anticipated as of the assessing date unaided by hindsight, [at 545, 189 A.2d 702]
This cardinal principal was applied in the case of Hudson Terrace Ap’ts. v. Fort Lee, 2 N.J.Tax 457 (1981), where the Tax Court held that the economic rent for the years 1978 and 1979 in the Borough of Fort Lee could not include the escrow fund consisting of rentals in excess of that rental allowed by the Fort Lee Rent Control Ordinance which was declared confiscatory by Helmsley v. Fort Lee, supra, on October 17, 1978. Accordingly, I hold that the taxpayer’s failure to allegedly pursue a hardship increase does not in any way bear on the determination of economic rent. No prudent investor would regard a potential hardship increase as a factor in fixing the fair market value of the property.
The Clerk of the Tax Court is directed to enter judgment as follows.
Block 153, Lot 1 Block 133, Lot 11-20
Land $32,300 $25,400
Improvements 62.350 54,150
Total $94,650 $79,550

An additional 24 units located in adjacent Borough of Lodi are not under appeal.

The pretrial conference had also been adjourned on at least two occasions. A settlement conference (ordered by the court) was adjourned and never held because of lack of preparation to discuss settlement by defendant.

The use of the unweighted, unclassified arithmetic average ratio for the 1978 tax year was changed to a weighted average based on sales in each class for the 1979 tax year and thereafter. Laws 1979, c. 51.

The coefficient of deviation is a most instrumental statistic in determining the existence of a common level. Since all ratios of assessments to market prices are not identical, it is useful to consider whether the ratios cluster around one focal point. That point is the average (mean) ratio. The variances from the mean of each individual ratio (assessments to sale) are also averaged to form a coefficient of deviation. Thus the coefficient is a statistic which measures the degree of departure of all ratios (assessments to sale) from the average ratio. Whippany Associates v. Hanover, 1 N.J.Tax 325, 334 (Tax Court 1980).

The chapter 123 ratio is actually a pre-tax year ratio. For all years other than the 1978 tax year it was the average, classified and weighted ratio: the 1978 chapter 123 ratio was the one year, unweighted and unclassified ratio. It was changed, according to the Committee Statement to Assembly Bill 1492 (L.1979, c. 51) because:
This averaging method is designed to avoid abrupt changes in ratio from year to year, and to avoid undue influence of inadequate sale samples in any single year.
Thus, a 1978 chapter 123 ratio is actually the 1977 ratio, and in 1978 it was a one-year unweighted, unclassified ratio.

This determination of true value is fully corroborated by the all-cash sale of the subject property in January 1978.

The issue to be decided does not necessitate the court to consider the sincerity of the taxpayer’s request for hardship relief. It unequivocally declines to do so.