KAHN, J.T.C.
This matter concerns the valuation of a garden apartment complex in the City of Clifton for the years 1981 and 1982 which was assessed as follows:
Land $ 3,564,000
Improvements $ 8,336,000
Total $11,900,000
*164 Taxpayer alleges that the assessments were discriminatory.
Physical Description
This property is located generally at the intersection of Allwood Road and Clifton Avenue with frontages on Allwood Road, Braun Place, Ridgefield Terrace, Addison Place, St. Andrew’s Boulevard, Brookside Drive and Clifton Avenue. The 58.6 acres of land is improved with one- and two-story frame structures containing 1,188 apartments and 324 garages which were constructed in and around 1949. Density is 21 units an acre. The buildings contain 3,978 rooms, averaging 3.35 rooms an apartment. There are 136 two-bedroom apartments, 502 three-room apartments, and 550 four-room apartments. The building was described by both parties as an early F.H.A. # 608-type project.
The original exterior improvements contained asbestos siding, ten% brick veneer, some wood-clapboard siding, and some wood shingles. The roofs were gabled with asphalt shingle and originally contained galvanized metal gutters and leaders. The interior consists of bathrooms with three fixtures and semi-modern kitchens. In 1979, as a result of a rehabilitation program, various improvements were made to-the roof; new gutters and leaders were installed; the original metal casement windows were replaced with aluminum thermopane windows; storm doors were added; the original 30-amp electrical service was replaced with 100-amp service in each apartment; new oil burners were installed; ceramic tile was placed in some, but not all, bathrooms; metal kitchen cabinets were installed; smoke detectors were installed; and landscaping was beautified.
Basically uncontroverted was the testimony that the rehabilitation program cost approximately $7,000,000. At that time the entire property was refinanced at an approximate total of $17,000,000 which included the cost of the rehabilitation program. Notwithstanding the rehabilitation efforts, there was testimony that certain FHA standards were still not satisfied. For example, the standards included a two-pipe heating system whereas the property contained a one-pipe heating system. *165 Other such requirements included 100% brick although only 10% was apparently installed.
Rent Leveling History of the City of Clifton
On or about October 1, 1974 the City of Clifton adopted rent control ordinance # 4249. The subject property, at all times relevant, was subject to the terms and conditions of this ordinance. Rent increases were limited to a percentage of the consumer-price index. The ordinance also contained a vacancy-decontrol provision permitting a landlord to charge a new tenant that rent which he saw fit to charge.
In 1980, pursuant to an agreement between the taxpayer and the municipality, the latter agreed to exempt the taxpayer from local rent controls with HUD regulations governing the project. On April 1, 1980 a five% capital improvement surcharge was implemented and passed on to all tenants. On May 20, 1980 the municipality passed a resolution exempting taxpayer from the rent control. On June 20, 1980, HUD allowed the rents of the taxpayer to be raised to yield a gross income of $4,207,644 and taxpayer attempted to implement increases beginning August 1, 1980 on leases up for renewal on August 1, 1980. On October 10, 1980 the Richfield Village Tenants’ Association instituted suit in the Superior Court challenging all of the aforementioned actions. On October 12, 1980 the Court determined that the capital improvement surcharge and the Clifton resolution were invalid and taxpayer was given ten months to return all monies that were collected under these actions. A formal judgment was entered embodying the above on December 1, 1980 and refunds began on or about January 1, 1981. These refunds, according to ledgers submitted by the taxpayer, totalled $139,282. The taxpayer attempted to have the city ratify the previous actions but the mayor and council refused to do so. In June 1981, the Clifton Rent Leveling Board, on application by the taxpayer, allowed a hardship and capital improvement increase in the amount of ten% combined. Implementation under same began August 1, 1981. In July 1981 HUD granted a preemption of local controls and allowed Rich- *166 field to increase rents to a gross rental of $3,964,266. The taxpayer implemented these increases beginning September 1981 through December 1981.
Thereafter, taxpayer attempted to effectuate collection of the increases and met considerable resistence from numerous tenants, compelling taxpayer to institute court proceedings to attempt to collect the increases.
Contentions of the Parties
Taxpayer relied predominantly on the income-capitalization approach to value and utilized a market comparison study as a corroboration thereof. The taxing district contended that its market comparison study is the best source of determining value, but it also offered the income-capitalization approach to bolster that valuation. A review of their respective approaches begins with a comparison of the income and expenses utilized by each party.
Taxpayer Municipality
October 1, 1980
Income and Expense Statement:
Apartment rentals $2,850,039
Garage rentals 46,206
Total Gross Rentals $2,896,245 Gross Income $3,258,582
Allowance for vacancies (2%) 57,925 Vacancy factor (1%) 31,799
Effective gross rentals $2,838,320
Laundry Room rental 5,204
Interest Income 26,681
Cancellation fees 5,634
Effective Gross Income $2,875,839 Effective Gross Income $3,266,783
Expenses:
Insurance $ 62,480
Heat 777,047
Electric & Gas 62,433
Garbage Disposal 37,777
Water 43,153
Payroll 155,069
Payroll taxes 25,010
Superintendents’ apartments 39,731
*167 Taxpayer Municipality
October 1, 1981
Repairs & Maintenance (5%) 144,812
Reserves (2%) 57,925
Miscellaneous (1%) 28,962
Management (5%) 141,916
Professional fees (stabilized) 8,000
Total Expenses 1,584,315 Total Expenses (35%) $1,129,374
Net Income 1,291,524 Net Income $2,097,409
Income and Expense Statement:
Apartment rentals $3,964,226
Garage rentals 46,656
Total Gross Rentals $4,010,882 Gross Income $3,656,608
Allowance for vacancies and losses (5%) 200,544 Vacancy factor (1%) 35,739
Effective Gross Rentals $3,810,338
Laundry room rental 42,936
Interest Income 3,983
Damages & cancellation fees 2,955
Late charges 15,039
Effective Gross Income 1,875,251 Effective Gross Income $3,620,869
Expenses:
Insurance 57,176
Heat 886,824
Electric & Gas 58,122
Garbage Disposal 54,486
Water 45,319
Payroll 173,131
Payroll Taxes 29,678
Superintendents’ Apts. 41,697
Repairs & Maintenance (5%) 200,544
Reserves (2%) 80,218
Miscellaneous (1%) 40,109
Management (5%) 190,517
Professional fees (stabilized) 1,000
Total Expenses $1,865,821 Total Expenses (35%) $1,267,304
Net Income $2,009,430 Net Income $2,353,565
*168 Taxpayer’s expert witness indicated that certain expense items were actual, while other items were lumped together as miscellaneous expenses, and others were stabilized in terms of percentages such as repairs and maintenance, reserves for replacements, miscellaneous and management fees. Generally, the witness justified the percentages for stabilization based on a review of the expense items set forth in taxpayers’ accountants’ statements and his knowledge of the type of project involved and the FHA requirements. Some of the stabilized items were less than the actual expenditures. For example, although legal fees amounted to $40,000 a year due to the heavy rent-leveling litigation, only $8,000 was used. It was the witness’ opinion that the expense items were within normal limits.
The taxpayer’s witness’ capitalization rate was an overall rate including interest, recapture and effective tax rate. The witness attributed 9% interest for the year 1981 and 9.50% for the year 1982, which was mainly based on a comparison of the subject investment with alternative investment yields, as well as interest rate trends for the dates in question. His recapture rate of 1.8% was based upon the witness’ conclusion that the building accounted for 70% of the total value of the property (30% for land) and that the building had a 40-year economic life. The effective tax rate was found by applying the Director’s unrounded average ratio (58.47% in 1981 and 54.22% in 1982) to the actual tax rate ($3.60 in 1981 and $3.57 in 1982). The composition of the capitalization rates follows:
1981 1982
Interest: 9.00% 9.50%
Recapture: 1.80% 1.80%
Effective Tax Rate: 2.10% 1.94%
Total: 12.90% 18.24%
By dividing the net income for 1981 of $1,291,524 by the capitalization rate of 12.9%, a value of $10,011, 814 rounded to $10,012,000 results. For 1982, by dividing the capitalization *169 rate of 13.24% into the net operating income of $2,009,430, a value of $15,176,964, rounded to $15,177,000 results.
Regarding land value, the witness reviewed a series of land sales which ranged between $1,000 and $4,400 a unit, and arrived at a value of $3,000 a unit. That value, according to the witness, was used merely to apportion the total value between land and building. It was his opinion that since the subject property was much larger than the comparable-sales properties, the unit values of those sales had to be discounted to reflect their smaller size.
Taxpayer’s witness also utilized a market-sales approach to establish the value of the subject property. On the basis of four comparable sales, he arrived at a value of $8,428 a unit for 1981 and $12,775 a unit for 1982. Because two of the comparable sales involved favorable (below market) financing, adjustments were made thereto. His sale # 4 involved a larger two-story brick and frame garden complex, a HUD # 608 project, which was located in New Milford, constructed by the taxpayer and was, according to the witness, the most comparable to the subject property in terms of age, condition and type of construction. The other sales properties were smaller with considerably fewer units which, according to the witness, required additional adjustments.
With respect to taxpayer’s income approach, the municipality contended that economic rent is not properly measured by the taxpayer’s use of actual rents. Clearly, where actual rents do not equal economic (market) rents, the latter must be employed in the capitalization of income approach. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963). It argues that even if actual rents are utilized, they should be the October 1 rents annualized. The city also argued that the concept of economic rent requires consideration of the fact that taxpayer’s high expense ratio and difficult financial situation would almost assure an FHA preemption, a windfall to a purchaser. That argument, according to the city, is borne out by the fact that, although the taxpayer was not allowed to collect all the rents it *170 sought under the proposed municipal relief, shortly thereafter and prior to October 1, 1981, the FHA did, in fact, preempt and allow substantial rent increases. Accordingly, it is the city’s position that the taxpayer’s economic approach did not adequately ascribe appropriate values to the property.
Concerning expenses, although the taxing district did not contest the fact that the expenses used by taxpayer had been incurred, it argued that those expenses should not be utilized unless economic rent is used, otherwise the ratio of expenses to income would be inordinately high and inappropriate. Therefore, the municipality’s witness allowed 35% for what he considered to be normal expenses. To his net income the city’s witness applied an overall capitalization rate of 12.12% for 1981 and 12.46% for 1982. To substantiate that capitalization rate, the municipality's witness relied on rates of return of competing investment opportunities and mortgage interest rates as compiled by the American Council of Life Insurance Companies. He stated that, in arriving at a capitalization rate, consideration should be given to the fact that a prospective purchaser would, in the very near future, be entitled to a substantial increase in rents due to FHA preemption as was borne out by the preemption granted in 1981. According to the witness, this involves the same type of anticipation of income as found in case law and, therefore, is justification for an adjustment to the capitalization rate. He argued that if economic rent were used, a higher capitalization rate would have been allowable because the risk is greater and vacancies would correspondingly increase.
City’s witness examined five properties in connection with his comparable-sales analysis for which he made cumulative adjustments for differences in time, physical characteristics and location. He paid little heed to the effective rent control and made no analysis of the financing in each sale. Thus, he was unable to determine whether an additional downward adjustment should be made. He did make an upward adjustment, however, because of the rehabilitation of the subject property in 1979 *171 which he quantified at $6,700 a unit. He arrived at a unit value of $16,900.
Concerning the New Milford property which, as previously noted, was also a # 608 HUD financed project, (taxpayer’s sale # 4) the witness indicated that the variation of interest rates and the method of financing therein did not affect his opinion of value in light of the fact that an investor, knowing that the Federal Government would preempt local rent controls, would have increased the rents thereby providing immediate dividends of substantial magnitude. Another city witness testified that the New Milford complex was in poor physical condition as compared to the subject property.
In sum, the major thrust of the municipality’s position is that the taxpayer did not ascribe appropriate economic rent from which to compute expenses and arrive at a valuation by the income approach. Secondly, the city contended that the 1979 rehabilitation project substantially influenced the value of the property as it introduced a degree of physical modernization that belies its age. In support of that contention the municipality pointed to the large amount of rehabilitation financing, approximately $17,000,000, which sum, however, included a refinancing of the original mortgages at a fairly low rate. All of the foregoing, according to the city, would provide an incentive to purchase at a higher price.
Analysis—1981
As noted above, the taxpayer placed primary emphasis on the income-capitalization method in valuing the property, whereas the municipality advocated the use of the market-sales approach. Case law and appraisal theory do not favor any one method, but instead dictate that each situation must be considered based on its own facts and circumstances. New Brunswick v. Tax Appeals Div., supra; Dworman v. Tinton Falls Bor., 1 N.J.Tax 445 (Tax Ct.1980), aff’d 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 459, 443 A.2d 709 (1981). The beginning point of all studies under the income capitalization method is the determination of *172 economic rent. Economic rent is defined as “the rental income that a property would most probably command in the open market as indicated by current rents being paid and asked for comparable space as of the date of the appraisal.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983) at 352. The burden of showing that actual rentals are economic is on the taxpayer. First Real Estate Investment Trust v. Hasbrouck Heights, 190 N.J.Super. 85, 89-90, 461 A.2d 1210 (App.Div.1983).
The taxpayer claimed that the total rent roll for 1980 ($2,850,-039) provided the economic rent for 1981. Taxpayer’s expert relied upon his knowledge of the community and the type of rentals that were being achieved. He opined that this type of building cannot produce an additional rent as it is governed by local rent, as well as Federal, controls. The municipality argued that as of October 1, 1980 the taxpayer, by reason of the municipality lifting its controls, was collecting higher rentals than that alleged, and thus the greater amount, approximately $3,900,000, should govern. Additionally, the municipality urges in the alternative that in the event the court accepts actual rent, the October 1, 1980 rent annualized is a better indication of economic rent since it gives a prospective purchaser a better indication as to the earning power of the property.
I find that based on the better weight of authority, the better indication of value for 1981 is the annualized October 1, 1980 rental, which initially amounted to $3,179,944. An analysis of rents must begin with the present rent schedule for the subject property. The Appraisal of Real Estate, supra at 358. I find that the October 1, 1980 rent schedule, which was the rent schedule as of the appraisal date, is a more accurate reflection of the earning power of the property for the tax year 1981. I also find that the October 1, 1980 annualized rental contains an amount that includes rental collected by the landlord but required to be returned by court order. I find this latter amount is $139,282, as documented by ledgers submitted by the taxpayer, and must be deducted from the rental of $3,179,944 in order to achieve economic rent.
*173 Normally valuation must be based upon facts known and anticipated as of the assessment date, unaided by hindsight. New Brunswick v. Tax Appeals Div., supra. In New Brunswick the taxpayer adjusted his valuation based on a rental reduction negotiated long after the assessment date, but the court disallowed that adjustment. Although the instant matter appears to be analogous in that rental receipts were reduced by a court decision after the assessment date, I find the case distinguishable for two reasons. First, the rental refunds were mandated approximately 45 days after the assessment and not “long after” the assessment date as in New Brunswick. Secondly, and more important, the refunds were a foreseeable occurrence at or before the time of the assessment. As of the assessment date the tenants had refused to pay the increases and threatened to file suit, which in fact was done on October 12, 1980, 12 days after the assessment date.
These two factors, proximity and foreseeability, were important in several other relevant cases. In Fort Lee v. Invesco Holding Co., 3 N.J.Tax 332 (Tax Ct.1981) the court stated that “[wjhile the use of subsequent events as direct evidence of value is not appropriate, a valuation predicated upon subsequent events may, in an appropriate situation, be utilized to corroborate an opinion independently arrived at and based on facts known or reasonably ascertainable as of the critical date.” Id. at 342. The case involved the use of actual rents received two years after the assessment date to corroborate the estimation of rents of the subject building which was made on the assessment date while the building was under construction. In Hudson Terrace Apts. v. Fort Lee, 191 N.J.Super. 489, 467 A.2d 1092 (App.Div.1982), rev’g 2 N.J.Tax 457 (Tax Ct.1981) the Appellate Division remanded the matter to permit the introduction of evidence of the effect on valuation of litigation pending on the assessment date. In Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (Tax Ct.1980), where objection was made to the use of a sale of the subject property subsequent to the assessment date, the court said:
*174 So long as a proffered sale is not remote, the sale should be admitted for its rational probative valuation inference. This court is constrained to conclude that a strict interpretation of the language in New Brunswick v. Division of Tax Appeals, supra, 39 N.J. 537, [189 A.2d 702] is not controlling on the issue involved herein since that case did not concern sales after a valuation date but rather diminished rental incomes subsequent to an assessment date. One cannot deny the logic of the equal rational probative value of a sale which occurs one day after the assessment date compared to its occurrence one day prior to such date. Appraisal experts are capable of making adjustments for time. As a matter of appraisal theory, adjustments must be made for time in any event in order to render a comparable sale an indication of value for the property under consideration. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 281. [at 37-38]
It is my opinion that the resolution of the tenants’ suit was both proximate and foreseeable. Rather than engage in speculation as to the probabilities of the outcome, and in effect, conduct a trial within a trial, the judicial determination of the suit will be given its full effect on valuation. To do otherwise would result in speculation detracting from the accuracy and meaningfulness of the assessment. Schmertz v. Dover Tp., 4 N.J.Tax 145, 150 (1982). The court will not blind itself to events that took place shortly after the October 1-assessment date. It is my conclusion that a prospective purchaser would not pay a price for property based on rentals under attack which conceivably could be overturned. An indication of the likelihood of such outcome was clearly presented by the outstanding rents and the inordinate legal fees incurred in attempting to collect same.
The municipality argued alternatively that the HUD increases, by way of preemption, of July 1981 were also foreseeable as of the assessment date, October 1, 1980. While HUD increases serve as protection of its interest, the increases are by no means guaranteed so as to permit an investor to rely thereon. Furthermore, I find that the HUD increase of July 1981 was too speculative and remote to be considered for valuing the property for 1981. However, as discussed infra, the HUD increase was recognized for the tax year 1982.
The better evidence of economic rent for 1981 is the October 1980 rent annualized, less the reimbursement amount, for a total of $3,040,622.
*175 The taxing district also urged that First Real Estate Investment Trust v. Hasbrouck Heights, supra, requires a taxpayer to conduct an investigation of market rents to demonstrate economic rent. The municipality argued that such study was not made and that the taxpayer, therefore, failed to meet its burden of proof with respect to economic rent. While it is ordinarily a requirement that such an investigation be undertaken, the results are rendered far less meaningful when rent controls are present. As recognized in 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206, 219 (Tax Ct.1981), rent controls artificially limit the income stream and in effect determine market rents for that district. A demonstration that rents charged are the maximum permitted under the rent control ordinance and federal regulations is sufficient to prove actual rents are economic. Good management requires nothing more. Even where there is no artificially controlled market, the Supreme Court in Parkview Village Asso. v. Collingswood Bor., 62 N.J. 21, 297 A.2d 842 (1972) held:
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation, [at 34, 297 A.2d 842]
The taxing district presented no significant evidence demonstrating that the economic rent should be anything other than the actual rentals.
With respect to vacancy and collection losses, the taxpayer sought a two% reduction despite the fact that the actual vacancy loss through December 31, 1980 was .0047%. Vacancy and collection losses are “usually estimated as a percentage of potential gross income. The percentage varies according to the type and characteristics of the physical property, the quality of tenancy, current and projected supply and demand relationships, and general and local economic conditions.” The Appraisal of Real Estate, supra at 361. From the testimony and evidence submitted, a lower vacancy and collection loss is required. This conclusion finds support in the miniscule actual vacancy and collection loss incurred and, therefore, I conclude *176 that the allowable vacancy factor for the 1981 tax year is one% as urged by the city.
There was a substantial divergence of opinion with respect to expenses. The municipality concluded that the expense-to-income ratio was so high as to warrant a finding of either bad management or non-consideration and thus, posited a 35% expense deduction. The taxing district further argued that certain other deductions included expenses of taxpayer’s other corporations. However, that claim finds no support in the record. The taxpayer, who operated on an accrual basis, set forth comprehensive ledger sheets enumerating the expenses. In itemizing various expenses the taxpayer acknowledged that certain expenses were stabilized where the actual expenses were significantly above or below the norm. As noted previously, legal and professional expenses, which amounted to some $40,000, were stabilized at $8,000.
I do not accept the municipality’s witness’ opinion that expenses should be inextricably related to an expense-to-income ratio. I find no authority in support of that proposition in terms of case law or accepted appraisal practice. The taxpayer’s expert offered a more sound approach in that a prospective purchaser would want to know the actual expenses in order to formulate his own standardization where particular expenses in a given year appear to be other than ordinary. Consistency is required and I find the taxpayer’s approach meets that requirement. The taxpayer’s appraiser conducted a sufficient investigation of the expense worksheets of taxpayer’s accountants and auditors, and I accept his position that specific authentication of taxpayer’s records is not warranted. I find all actual expenses used to be appropriate, including the deduction for rentals of supervisor’s apartments, which rents were included in gross rentals. An appraiser, however, is required to review, reanalyze and investigate where expenses on the surface appear unreasonable. I find that even without a substantial investigation by the taxpayer’s expert, he obviously made findings that some of the expenses were not appropriate and made accommodations toward a standardization. I am satisfied that *177 this process adhered to sound appraisal theory despite the fact that the expense-to-income ratios may be considered high. I am mindful of the fact that the subject property is an older, lower-income facility commanding lower rents, despite the 1979 rehabilitation. In fact, relief was accorded by the United States Government by a preemption for 1982.
I, therefore, accept the expenses as itemized by the taxpayer’s expert and find the income, vacancy and expenses as follows:
Gross Income:
Apartment Rentals $ 3,039,944
Garage Rentals 46,206
Total Gross Rentals $ 3,086,150
Less allowance for vacancies and losses (1%) 30,862
Effective Gross Rentals $ 3,055,288
Laundry Room Rental 5,204
Interest Income 26,681
Cancellation Fees 5,634
Effective Gross Income: $ 3,092,807
Expenses:
Insurance 62,480
Heat 777,047
Electric and Gas 62,433
Garbage Disposal 37,777
Water 43,153
Payroll 155,069
Payroll Taxes 25,010
Superintendents’ Apartments 39,731
Repairs and Maintenance (5%) 154.308
Reserves (2%) 61,723
Miscellaneous (1%) 30,862
Management (5%) 154.308
Professional Fees (stabilized) 8,000
Total Expenses: $ 1,611,901
Net Income: $ 1,480,906
*178 With respect to the capitalization rate, taxpayer used a form of the building-residual technique which included an independent finding of the value of land based upon comparable sales and a capitalization rate for the building based on an interest rate and projected recapture. The taxing district utilized an overall rate primarily based upon comparison with investment opportunities. To a great extent, both parties relied upon the American Council of Life Insurance tables and other similar indicia demonstrating returns on comparable investments. Although their analyses differed on technical bases their resulting capitalization rates were not far apart. It is clear that capitalization rates should be determined by the marketplace. The Appraisal of Real Estate, supra, at 280. In this case, I find that the municipality’s expert’s opinion of a capitalization rate is on firmer ground. First, I find that taxpayer’s land analysis is based on a mix of sales involving small tracts as well as larger tracts with an unsupported attempt to reduce the value to a unit basis. I note also that there appears to be no consistency among the properties and the resulting unit value is derived by a combination of subjective factors. The municipality’s appraiser, on the other hand, appeared to analyze the most comparable investments in arriving at an overall rate. I find that an overall rate is more suitable for the subject property because an investor would not view the land and building as separate increments of value for purposes of analyzing the income stream and expenses, but would analyze a purchase price for the combined land and building. I conclude that the capitalization rate for 1981 is 12.12% as advocated by the taxing district. By dividing the capitalization rate of 12.12% into the net operating income of $1,480,906, the value is found to be $12,218,696.
The municipality claims, however, that the income capitalization method does not take into consideration the massive rehabilitation project that took place in 1979 which, as urged by the appraiser, adds value to the property. There was conflicting testimony as to the extent and purpose of the rehabilitation project. The taxpayer claimed that the project merely restored *179 the property and protected existing rent levels, while the municipality claims that the rehabilitation project increased the value of the property to a prospective purchaser. It is my finding that any increase in value due to the rehabilitation project would be reflected in the income capitalization approach by increased rentals. Accepted appraisal methodologies recognize and expect changes in real estate revenues according to the degree of rehabilitation performed on the property. The Appraisal of Real Estate, supra at 592. It is my finding, however, that unless this rehabilitation project provided increased rentals, thereby increasing the income stream, the mere fact of rehabilitation cannot be considered independently or as an addition to value.
Turning to the city’s comparable sales approach, I note that most of the properties used as comparables were from the Morris County area. The major exception was the FHA # 608 project in New Milford in Bergen County which was constructed by this taxpayer at about the same time as the subject. The appraiser used a “cumulative adjustment” for time, location and physical differences in order to develop a unit price. Admittedly, the appraiser subjectively based the adjustment factors on his experience to account for those differences. The witness also admitted that he made no adjustment for the existence, or nonexistence, of rent control in the communities in which the comparables were located. Nor did he perform a cash-equivalency analysis of the terms of financing on the sales prices of the comparables. Such considerations are significant factors which should have been incorporated in the municipality’s appraiser’s sales analysis.
I find that both experts in using the comparable-sales approach, used overriding subjective factors which detract from their conclusions. As aforesaid, the municipality’s witness utilized properties of varying sizes, ages and locations, and simply made one cumulative adjustment of these various factors in order to arrive at a unit valuation. In commenting on the problems of making adjustments, in Schmertz v. Dover Tp., supra, the court said:
*180 One of the pitfalls frequently encountered by the appraisers “is the problem of support, justification, and documentation of the adjustments used in the Direct Sales Comparison Approach.” Terry, “Support and Justify: An Associate’s Problem,” The Real Estate Appraiser and Analyst (September-October 1978), at 28. Adjustments, if they are to be of use to the court in determining value, must be supported and justified. In order to make proper adjustments, the appraiser is required to "go into the market and get the data.” Ibid. The plaintiff’s appraiser did not “get the data” to support, justify and document his adjustments. An appraiser should “not make adjustments for the sake of an adjustment____ [Appraisers, are interpreters of the market, [tjhey do not make the market.” Id. at 31. [4 N.J. Tax at 150].
To his unit value, the expert added an adjustment amounting to approximately $6,700 a unit for the rehabilitation aspect in addition to physical factors already included in the cumulative adjustment. I have already indicated that there is no basis or authority for the inclusion of such a factor where there is such significant, documented information and evidence as to the income stream, capitalization rate and expenses from which to draw a conclusion of value. The taxpayer’s analysis also contained similar subjective adjustment factors which pale in the face of the significant evidence supporting the income-capitalization approach. I find that the sales-comparison approach conclusions, viewed either independently or as corroborative evidence, do not aid the court in its determination of value.
I conclude that the income-capitalization approach is the best appraisal method for valuing this property. Confronted with a detailed analysis of the income stream and expenses on the one hand, and the sales-comparison approach as offered by the municipality on the other, I do not believe that a prospective purchaser would give greater weight to subjective adjustment factors in sales of other properties not in the geographical market than to the return on invested capital. In Helmsley v. Fort Lee Bor., 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979), the Court indicated that the “preferred valuation method for apartment buildings is the capitalization of income, since investors purchase apartment buildings as income producing properties.” Id. at 213-214, 394 A.2d 65. This preference is also restated in Fort Lee Bor. v. Hudson Terrace Apts., 175 N.J.Super. 221, *181 227, 417 A.2d 1124 (App.Div.1980), certif. den. 85 N.J. 459, 427 A.2d 559 (1980); Park View Village Associates v. Collingswood. Bor., 62 N.J. 21, 23, 297 A.2d 842 (1972). This view has also been accepted by the Tax Court: 525 Realty Holding Co. v. Hasbrouck Heights Bor., 3 N.J.Tax 206 (Tax Court 1981); Middlesex Builders, Inc. v. Old Bridge Tp., 1 N.J.Tax 305 (Tax Ct.1980).
Some courts have also indicated that replacement costs are less relevant to valuation. As the court stated in Middlesex Builders v. Tp. of Old Bridge, supra, “The cost of construction, i.e., the cost of the bricks and mortar, is of little or no importance to a prospective purchaser as his chief concern is with the income that he can expect to receive.” Id. at 313-314. The replacement cost is generally relied on to value special purpose or unique structures for which there is no market and is, therefore, inapplicable where, as here, there is an apartment complex. See also Dworman v. Tinton Falls Bor., supra, and Berkeley Development Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (Tax Ct.1981).
Turning to the question of discrimination, N.J.S.A. 54:51A-6, (commonly known as Chapter 123), provides in pertinent part:
a. Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property____
The core of Chapter 123 is found in N.J.S.A. 54:l-35a and N.J.S.A. 54:l-35b, which establish the statistical formula for an action grounded in discrimination. These sections define the key terms “average ratio” as “that ratio promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1-35.1 et seq. as of October 1st of the year preceding the tax year,” and the “common level range” as “that range which is plus or minus 15% of the average ratio for that district.” The Director of the Division of Taxation is directed, on or before April 1 in each year, to determine the average ratio and common level range. The average ratio for Clifton in 1981 was *182 59% with upper and lower limits of 68% and 50%, respectively. Here the ratio of assessment ($11,900,000) to true value ($12,-218,696) is 97%. Thus relief from discrimination is warranted. The proper assessment is thus found to be $7,209,030.
Taxpayer’s argument that the proper assessment should be based on the unweighted-unclassified ratio rather than on the Chapter 123 ratio was addressed by the Supreme Court in Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984) where it was stated:
... [T]o the extent that a taxpayer relies on a presumptive ratio to establish a common level of assessment, we find that the Legislature intended to restrict the taxpayer to the Director’s average ratio determined under Chapter 123. In the absence of additional proof, a taxpayer may not substitute another statutory ratio, such as that computed under N.J.S.A. 54:1-35.1. To overcome the presumption that the Chapter 123 ratio reflects the common level, the taxpayer must establish that application of the ratio would be “virtually confiscatory.” 525 Realty Holding Co. v. Hasbrouck Heights, supra, 3 N.J.Tax at 216. As a practical matter, the presumption created by Chapter 123 is so strong that it will be conclusive in all but the most egregious cases. Jefferson House Investment Co. v. Chatham, supra, 4 N.J.Tax at 682-84. [95 N.J. at 463, 471 A.2d 1196],
In Weyerhaeuser Co. v. Borough of Closter, 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983) the court said:
Chapter 123 was designed “to alleviate the statistical sleight-of-hand inherent in pre-Chapter 123 discrimination claims” and to “ ‘fortify the fundamental, cardinal principle of taxation—stability of assessment.’ ” Id. 187 N.J.Super. 455 at 461, 455 A.2d 504, quoting 525 Realty Hold. Co. v. Hasbrouck Heights, 3 N.J.Tax 206, 216 (Tax Ct.1981). Once the true value has been found from the proofs the only available challenge to the application of Chapter 123 to determine discrimination relief is whether there has been “error in the ... calculations. ...” Id. 187 N.J.Super. at 463 [455 A.2d 504],
... [T]ax discrimination is a constitutionally mandated remedy available to taxpayers and municipalities. If the figures established by Chapter 123 for the average ratio and common level are arrived at in an arbitrary, capricious, or erroneous manner, or are themselves discriminatory, a litigant would be deprived of this constitutional remedy unless he had the right to challenge them, [at 539, 464 A.2d 1156],
Here taxpayer submitted no proofs that satisfy me that the Murnick-Weyerhaeuser tests have been met. Its claim for the application of the unweighted-unclassified ratio is rejected.
I also reject taxpayer’s claim that the unrounded “school aid” ratio promulgated by the Director pursuant to N.J.S.A. 54:1- *183 35a in October 1980, which is the forerunner of the Chapter 123 ratio, should be used. The school-aid ratio is carried out to four decimal places, whereas the Chapter 123 ratio is rounded to two decimal places. Although that practice was abandoned in 1984, I am nevertheless compelled by statute to apply the ratio promulgated on April 1, 1981 which was 59%.
Analysis—1982
The evidence, testimony and the documentation demonstrate a significant change in the income stream for 1982. During the time period prior to October 1, 1981, the relevant assessment date, the taxpayer received an FHA preemption allowing the taxpayer to raise the rentals to $3,964,226, which amount was utilized by the taxpayer’s expert in his opinion under the income-capitalization method. The testimony reflects general agreement between the parties as to the taxpayer’s efforts to seek relief from the municipal rent leveling restraints. Although the municipality utilized a lesser amount for the 1982 gross annual income since the preemption figure was known prior to October 1, 1981, a prospective purchaser would have been in a position to begin his analysis with the actual figure. There would be no need for conjecture as to 1982. I, therefore, find the gross rentals to be $3,964,226.
Additional income in the amount of $110,669 from garage and laundry room rentals, interest income and miscellaneous fees raises the total gross income to $4,074,895.
With respect to vacancy and collection loss, the taxpayer sought a five % allowance while the municipality recommended one%. The municipality’s witness argued that the actual vacancy and collection losses for 1980 and 1981 were well below one % and therefore, although a vacancy and collection loss is appropriate, no more than one % is required. Although I accepted the municipality’s expert’s recommendation for the year 1981, the allowance must be altered for the year 1982. The history of the subject property demonstrated that when rent increases were permitted (although subsequently reversed by the Superior Court), the implementation of the increases *184 caused litigation and withholding of rent by the tenants. This occurred in 1980 even at a time when the increases were basically modest. The record also demonstrated the necessity of the taxpayer incurring substantial legal costs to defend its position, which costs were stabilized at a figure greatly less than actually incurred.
I conclude that upon the implementation of the substantial increase in rental as permitted by the FHA preemption, a purchaser would have the right to project not only substantial litigation instituted by the tenants, but also difficulty in collecting both existing and increased rentals. Certainly the taxpayer ultimately might collect the major portion of potentially withheld rents and the like. I conclude, therefore, that a four % vacancy and collection loss is warranted under the circumstances. Four % of the gross annual income ($4,010,882) is $160,435. The resulting effective gross income is $3,915,360.
With respect to expenses, the municipality again contended that only 35% of effective gross income should be allowed, and again argued that the expenses would be allowable only if economic rent were utilized. For the year 1982 I make the same findings as I did for 1981 as to expenses itemized by taxpayer. The structures, although rehabilitated, are nevertheless old and require substantial maintenance and repair. I find that the expenses actually incurred, as well as stabilized by a percentage as enumerated by the taxpayer, are supported by testimony and were demonstrated as being reasonable by the greater weight of the evidence.
The municipality’s contention for the use of a 35% maximum expense factor is even less applicable in 1982 than in 1981. While it might be arguable that taxpayer’s income was low in 1981, in 1982 the use of the granted preemption amount by the taxpayer was acceptable to the municipality in its appraisal and, therefore, is considered economic rent.
The municipality pointed to the fact that the expenses—effective-gross-income ratio approximates 50%. However, again I find that in older buildings such as the subject building, with *185 rent control and federal preemption, these ratios cannot be controlled and should not be paramount in the consideration of valuation. I find that the expenses allowable shall be as follows:
Insurance $ 57,176
Heat 886,824
Electric and Gas 58,122
Garbage Disposal 54,486
Water 45,319
Payroll 173,131
Payroll Taxes 29,678
Superintendents’ Apts. 41,697
Repairs & Mainten. (5%) 200,544
Reserves (2%) 80,218
Miscellaneous (1%) 40,109
Management (5%) 190,517
Professional Pees (stabilized) 8,000
Total Expenses (47.6%) $1,865,821
By deducting these expenses from the effective gross income, the net operating income for 1982 is $2,049,539.
As for 1981, the taxpayer again found a capitalization rate based on an overall interest rate, which he deemed to be 9.5%, a recapture rate of 1.80% (70% of 2.5%), and an effective tax rate based on the average ratio (54.22% of the tax rate $3.57) of 1.94%, making a total capitalization rate of 13.24%. Also, as for 1981, the witness selected the interest rate by comparison with alternative investment returns and interest rate trends. The recapture, he explained, is based on the improvements constituting 70% of the total property with a remaining economic life of 40 years. On the basis of his sales comparison study of land sales, he allocated a land value of $3,000 a unit. The municipality’s witness, as he did for 1981, selected an overall rate of 10.5% plus a tax factor of 1.96% for a total of 12.46%. The City’s expert utilized the rounded average ratio as promulgated by the Director of the Division of Taxation.
As was the case for the year 1981, the parties used much of the same data in order to derive the capitalization rates. *186 Again, I find that the taxpayer’s method requires a more detailed analysis. Aside from the selection of an appropriate interest rate, a determination is necessary as to the percentage of improvements to total property.
I, once again, find that the city’s expert’s determination of a capitalization rate is better supported by the testimony and evidence. It appears that the municipality’s expert considered the tax advantages and the potential for growth in income, which fact has also been demonstrated by the FHA finding that a preemption was necessary. As set forth in my analysis of the 1981 year, a capitalization rate takes into consideration the fact that extensive rehabilitation had been performed, all of which became part of total financing by the taxpayer with little or no dollars expended on an outright basis by the taxpayer. These are benefits clearly not reflected nor even considered in taxpayer’s capitalization method. Some of these considerations have not been totally quantified by either party but authority does not require complete quantification. An appraiser, as well as a potential purchaser, has the right and obligation to consider these matters and I find that the city’s expert did so properly.
Accordingly, I find that a 12.46% capitalization rate is supported by the evidence and will be used in the court’s recomputations. Dividing the capitalization rate into the net operating income produces a value under the income approach of $16,488,-949.
As was the case in the 1981 analysis, I find that the market-sales approach required too many subjective adjustments and is clearly not the method by which a prospective purchaser would view this property, especially in light of the predictable income stream and expenses demonstrated by the parties. The court also iterates its conclusion that the addition of a unit factor for the gross costs of the 1979 rehabilitation project is not supported by any authority. Accordingly, I find that the value of the subject property for 1982 is $16,448,949 as determined by the income-capitalization approach.
*187 The true value of $16,448,949, when divided into the assessment of $11,900,000, produces a ratio of 72.35%, which exceeds the Chapter 123 upper limit of 64%. For the reasons previously stated, relief will be afforded by applying the rounded Chapter 123 ratio for 1982 of 55% to the true value to determine the proper assessment. That assessment is $9,046,922.
In both years, I am not satisfied with the independent proofs of the land and building components. Therefore, the same proportion as each component bore to the original assessment will be utilized in allocating assessed values to land and improvements.
For the foregoing reasons, the Clerk of the Tax Court is directed to enter judgment (rounded) as follows:
1981 1982
Land $2,162,700 $2,714,070
Improvements $5,046,300 $6,332,830
Total $7,209,000 $9,046,900