**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



**MALA SUNDAR**
**PRESIDING JUDGE**

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

June 17, 2021

Amber N. Heinze, Esq.
Irwin & Heinze, P.A.
Attorney for Plaintiffs

Kerry E. Higgins, Esq.
Mckenna, DuPont, Stone & Washburne, P.C.
Michael R. Burns, Esq.
Marmero Law, LLC
Attorneys for Defendant [1]

>    Re:    Spring Terrace Apartments, LLC v. Freehold Borough
>    Block 43, Lot 2
>    Docket No. 001548-2017
>    Tower Spring Terrace, LLC v. Freehold Borough
>    Block 43, Lot 2
>    Docket Nos. 002029-2019; 003045-2020

Dear Counsel:

This opinion constitutes the court's decision following trial of the above-captioned matters.

Plaintiffs[2] own the above-captioned property (Subject), an apartment complex on a 6.5-acre lot in defendant taxing district (Borough), identified as Block 43, Lot 2. The complex includes eight two-story garden style buildings with 55 rental units in total. The challenged assessments[3] were:

|  | 2017 | 2019 | 2020 |
|---|---|---|---|
| Land | $1,210,000 | $1,694,000 | $2,117,500 |
| Improvement | $3,775,200 | $4,976,600 | $5,127,500 |
| Assessment | $4,985,200 | $6,670,600 | $7,245,000 |

---

[1] Michael R. Burns, Esq., substituted in after the matter was tried, and submitted a post-trial brief.
[2] Plaintiff Spring Terrace Apartments owned the Subject during tax year 2017. Plaintiff Tower Spring Terrace LLC owns the Subject for tax years 2019 and 2020.
[3] Tax year 2017 involved only the Borough's counterclaim. Tax years 2019 and 2020 included plaintiffs' appeals and the Borough's counterclaims.

Each party's real estate appraiser was offered to, and accepted by, the court as an expert in real estate appraisal. Prior to trial, the parties stipulated to the following: (1) physical aspects of the Subject; (2) the highest and best use (HBU) of the Subject is its current use; (3) the "appropriate method of valuation is the income capitalization approach;"[4] (4) the Subject's effective gross income (EGI) was $799,880 and $827,604 for each tax year 2019 and 2020; and (5) the tax rates for tax years 2017, 2019 and 2020 were $2.712; $2.650; and $2.662 respectively. The remaining areas of dispute were: (1) the EGI for tax year 2017; (2) the appropriate provision for operating expenses (should it be actual or estimated); (3) the appropriate provision for reserves; and (4) the appropriate capitalization (Cap) rates.

For the reasons set forth below, the court finds (1) the EGI for tax year 2017 is $769,200; (2) use of actual operating expenses for insurance and utilities is appropriate for 2019 and 2020 tax years, and some of the other operating expenses are more appropriately estimated; (3) the appropriate provision for reserves is 5% of EGI for tax years; and (4) the appropriate Cap rates are those used by the Borough's appraiser, which with the stipulated tax rates provide an overall Cap rate (OAR) of 8.66%; 8.34%; and 8.20%. As a result, the court finds the Subject's value (rounded) as $6,013,700; $6,470,300; and $6,706,500 for each tax year 2017, 2019 and 2020.

**SUBJECT DESCRIPTION**

The parties stipulated that the Subject is a 6.5-acre irregular-shaped lot and is improved by a circa-1960s apartment complex consisting of eight two-story buildings. There are a total of 55

---

[4] Under the income approach, and prior to the EGI stipulation, each appraiser's value conclusion was as follows:

|  | 2017 | 2019 | 2020 |
| --- | --- | --- | --- |
| Plaintiffs' Appraiser | $4,560,000 | $5,040,000 | $5,330,000 |
| Borough's Appraiser | $6,500,000 | $7,100,000 | $7,415,000 |

Units (40 one-bedroom and 15 two-bedroom). The Subject is in the R-4 Residential/Apartment zone, and in average condition.

The buildings are garden-style with brick exterior wall. One of the buildings is located along Spring Street at its intersection with Spring Terrace, while the other seven are located on Spring Terrace. Spring Terrace is a two-lane tertiary paper roadway with a dead end within the Subject. The Subject is conveniently located with proximity to the Borough's downtown and public transportation.

The gross building area is 50,160 Square foot (SF) of gross building area (GBA) with about 70 parking spots. The one-bed and one-bath units measure 850 SF, and the two-bed and one-bath units measure about 1050 SF. Each unit has electric baseboard heating and two air-conditioning (A/C) units provided by the landlord. Tenants pay rent plus electric, and remaining expenses are borne by the landlord. Leases are on an annual basis.

The basements are unfinished. There is a laundry room[5] in the basement of building Six, which also contains an office area and tool room. The Subject is maintained by a live-in Superintendent who occupies a one-bedroom unit, and was paid $16.40 per hour, and a part-time administrative employee who maintained the leases and showed the units to prospective tenants. Plaintiffs' representative testified that the part-time employee's salary was allocated to the Subject by a related entity.

Plaintiff Spring Terrace Apartments, LLC ("Plaintiff 1") owned the Subject until 2017. On December 15, 2017, it sold the Subject to plaintiff Tower Spring Terrace, LLC ("Plaintiff 2") for $8,300,000, through a straw entity. Plaintiff 1 provided financing of $6,225,000 at 4% interest for

---

[5] The laundry room has eight washing machines (charging $2 per wash) and four dryers (charging $1.50 per load).

a 30-year period, with a 10-year balloon payment, and secured the loan by a nonrecourse mortgage on the Subject. Plaintiff 2 then sold another an older 48-unit apartment complex located in Elizabeth ("Elizabeth Property") to an unrelated party for $5,025,000 on April 4, 2018.[6] Plaintiffs and their appraiser call this a "reverse" I.R.C. §1031 like-kind exchange.

Following purchase of the Subject, Plaintiff 2 made extensive repairs (exterminators) and renovations (bathrooms and kitchens). It continues to make as-needed repairs and/or renovations (the latter only when units are vacated).

Plaintiffs are part of a family of real estate entities whose business is real estate ownership and management (the operating entity is a limited partnership, and all 150 partners therein are also partners in entities which manage real estate, mostly garden-style apartments similar to the Subject and in similar markets). The family together own and manage 23 properties in New Jersey and New York, 21 of which are garden-style apartment complexes. Parties agree that both plaintiffs are experienced in apartment operations and management.

**HIGHEST AND BEST USE**

"The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 268 (Tax 2013) (citations omitted), aff'd, 28 N.J. Tax 337 (App. Div. 2015). "Actual use is a strong consideration" when analyzing the highest and best use (HBU) "of an improved property." Ibid. (citation omitted).

---

[6] Neither the Subject's purchase nor the Elizabeth Property's sale was marked by the Borough's assessor as non-usable for purposes of Chapter 123.

Both appraisers opined that the Subject's HBU is its current use as improved. Based on their respective analyses, the court agrees with their conclusion.

**VALUATION**

A complainant (or a counterclaimant) carries a dual burden of first overcoming an assessment's presumptive correctness, and thereafter, of persuading the court of the correct value of the property. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377-78 (Tax 1998); Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J. Tax 153 (Tax 1988). The court can only determine the true value of the property based upon "the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430 (1985).

Both parties' appraisers provided an opinion which was based on an accepted valuation methodology for apartments. As such, their opinions raise a debatable question whether the imposed assessments are accurate. Therefore, the court finds that the parties have overcome the initial presumptive correctness of the assessments (plaintiffs, for tax years 2019 and 2020, and the Borough for tax year 2017). It will now examine the proffered evidence and whether it suffices to change the imposed assessments.

**APPRAISERS' VALUE CONCLUSIONS**

Both appraisers used the income approach. Under this approach, an appraiser should: (1) determine the potential gross income (PGI) for the GBA; (2) reduce the same by a market-based vacancy and collection loss provision, which will then provide the EGI; (3) deduct from EGI certain operating expenses (excluding real property tax); and (4) capitalize the resulting net operating income by a Cap rate. For a tenanted property such as an apartment complex, the effective tax rate is added to the Cap rate. See Jefferson House Invest. Co. v. Borough of

Chatham, 4 N.J. Tax 669, 677 (Tax 1982) ("[t]he actual taxes assessed are reflected in the income approach by including the effective tax rate" in the Cap rate).

Both appraisers agreed that the Subject's monthly rents were at market, that the Subject was well-managed, and that the tenant turnover was relatively stable for the tax years at issue. As noted above, parties stipulated to the EGI for tax years 2019 and 2020 (thus, there is no dispute as to the items comprising the EGI). Post-trial, parties clarified that the stipulated EGI included the "projected rental income for the Superintendent's apartment."

*(1) EGI for Tax Year 2017*

Plaintiffs' appraiser claimed that there was no information of rents in 2016 since the Subject was purchased in 2017. Based on his conversations with plaintiffs and data from CoStar on rentals (in Monmouth County and ten properties in the Borough), he opined that rents increased 2% annually, thus, "applied a 2% annual growth rate to back track to 2016 market rental rates." He thus applied 4% his concluded EGI for tax year 2020 ($828,000) which provided him $794,880 as the Subject's annual gross rental. He reduced this by 4% vacancy/collection loss and added $6,000 as other income. He also deducted $13,824 towards the Superintendent's rent, estimated as a 4% deduction from the 2018 market rent. His concluded EGI was $755,261.

The Borough's appraiser concluded a slightly higher annual gross rental of $795,000. The actual rents as of 10/1/2016 were $1,150 for one-bedroom, and $1,350 for two-bedroom, which rents, the Borough's appraiser testified, was obtained as part of the owner's Chapter 91 response to the Borough's assessor for that tax year. He also added $6,000 as other income and used 4% as vacancy/collection loss for an EGI of $769,200.

The court will accept the Borough's appraiser's annual gross rent amount since it was based on the actual amounts earned. Generally, when income is imputed to a rent-free unit occupied by

the superintendent or other employee, and is included in a property's potential gross income, a commensurate deduction as salaries/wages is appropriate. Parkway Village Apartments Co. v. Twp. of Cranford, 8 N.J. Tax 430, 446 (concluding that it was proper to provide, as an operating expense, "an allowance" for units occupied by the superintendents, "because the owner was charged with the income to be achieved from these two units yet was not receiving the rent in full because the apartments constituted additional compensation to the stated employees"), rev'd on other grounds, 108 N.J. 266 (1987); Brunetti v. City of Clifton, 7 N.J. Tax 161, 176 (Tax 1984) (finding "appropriate . . . the deduction for rentals of supervisor's apartments, which rents were included in gross rentals").

Since the stipulated EGI for tax years 2019 and 2020 included the imputed rental for the live-in Superintendent's unit, the court also will disregard plaintiffs' appraiser's deduction of the same for tax year 2017.[7] Thus, the court finds the EGI for tax year 2017 as $769,200.

*(2) Operating Expenses*

The actual operating expenses of a well-managed apartment complex should be considered as representative of the market when they are "within normal operating limits." Parkway Village Apartments Co., 8 N.J. Tax at 441-42. However, if "expenses [are] . . . unusually high, an adjustment must be made to fit the 'well-managed' standard." Equitable Life Assur. Soc. of U.S. v. Twp. of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). See also Brunetti, 7 N.J. Tax at 176 ("An appraiser . . . is required to review, reanalyze and investigate where expenses on the surface

---

[7] For tax years 2019 and 2020, plaintiffs' appraiser had deducted $15,088 (about $1,258 per month) and $18,431 (about $1,536 per month) as rent for the Superintendent's unit. These were amounts reported on the I&E statements as "Administrative Rent" and deducted in computing the Subject's "Rental Income." The rent rolls as of September 2018 and 2019 showed "Admin rent" as $1,200 and $1,240 respectively. Plaintiffs' appraiser noted that the Superintendent was "let go in 2018" thus, the difference in the "admin" rent "represents partial rent while he was employed."

appear unreasonable"). It is undisputed that the Subject is a well-managed property. Therefore, its reported expenses are deemed reasonable unless established otherwise.

Plaintiffs' appraiser determined the operating expenses in the amounts reported, and as categorized in Plaintiff 2's I&E statements for tax years 2019 and 2020 (with the line items comprising each category) as reasonable and at market, except for extermination fees for 2019 which he stabilized. The categories on the I&E statements were administrative, management fees, advertising, salaries & benefits, property maintenance, insurance, and utilities. The expenses totaled $265,645 or $4,830 per unit (tax year 2019) and 275,783 or $5,014 per unit (tax year 2020), which was 33% of each tax year's EGI. For tax year 2017, the appraiser estimated the operating expenses at $264,341 which was 35% of the EGI he had computed for that tax year.

The Borough's appraiser's categorized the expenses as insurance, utilities, repairs and maintenance (R&M), and management/administration/salaries. He estimated insurance and utility expenses at a per-unit or per SF (PSF) basis, and as a percentage of EGI for remaining two categories. The total operating expenses was $206,326; $200,481; and $210,279.[8]

*(i) Insurance and Utilities*

The court accepts the actual (reported) expenses for insurance and utilities on Plaintiff 2's I&E statements as reasonable for tax years 2019 and 2020. That the actual utilities expenses are lesser than the Borough's appraiser's estimate or the data from Institute of Real Estate Management (IREM) for garden type buildings in Southern New Jersey do not render them incredible since "a prospective purchaser would want to know the actual expenses in order to formulate his own standardization where particular expenses in a given year appear to be other

_____

[8] Because the parties stipulated to the EGI for 2019 and 2020, the operating expenses which were computed as a percentage of EGI changed from that contained in his report, as did the total.

8

than ordinary." Brunetti, 7 N.J. Tax at 176. For tax year 2017, the court accepts the Borough's appraiser's estimates for these expenses since there was no breakdown from plaintiffs' appraiser.

*(ii) R&M – Property Maintenance*

The costs reported on Plaintiff 2's I&E statements, as a percentage of the stipulated EGI for 2019 and 2020, is 9.8% and 6.5%. The Borough's appraiser's estimate would be 9% of his EGI for tax year 2017; and 8.95% and 8.5% of the stipulated EGI for tax years 2019 and 2020.[9]

The IREM data for Maintenance (which included security, grounds maintenance, maintenance repairs, and painting/decorating) for "garden type buildings" in Southern New Jersey shows the ratio of this expense to "gross possible income" (which includes rental and other income, less vacancy and collection loss, thus is the EGI) of 9.1% (2016 data); 7% (2018 data); and 6.3% (2019 data). This data is more persuasive than the "Income/Expense Analysis: Conventional Apartment" data attached to the Borough's appraiser's report, which is on a nation-wide basis, which reported R&M costs were low for garden-style apartments at a median of $0.45 PSF of rentable area in 2016; $0.45 PSF in 2017; and $0.53 PSF in 2018. Note that this data source also showed that the among operating expenses, "maintenance expenses" were $0.90 PSF and $0.93 PSF or 6% to 7.5% of EGI (there was no indication of what comprised maintenance expenses).

Based on the evidence before it, the court concludes that a stabilized allowance of 9% of the EGI for the tax years at issue is appropriate especially since the parties agree that the Subject is well-managed and well-maintained. The resulting expense is $69,228 (tax year 2017); $71,989 (tax year 2019); and $74,484 (tax year 2020).

---

[9] The Borough's appraiser used an estimate of 7% of EGI, to which he added $15,600 for "additional cost and lease up time to attract new tenants." His final figure for tax year 2017 is $69,444; and for tax years 2019 and 2020, using the stipulated EGI, is $71,592 and $73,532 respectively.

*(iii) Management/Administrative/Salaries/Miscellaneous*

Under "administrative" category, Plaintiff 2's I&E statements show several items such as various repairs, painting, licenses, permits, legal or professional fees, office expenses, computer expenses, landscaping, snow removal, security, and supplies. Management fees were separately categorized and was paid for offsite services (rent collection, financial activities, office functions, repairs or renovations) to a related entity (an "umbrella partnership"), Tower Management, LLC. Advertising category included tenant placement, referral fees, and promotions. Salaries and benefits category included office salaries, maintenance salaries, commissions, employee benefits, payroll taxes, worker's compensation insurance. For tax years 2019 and 2020, the ratio of each expense to the stipulated EGI is:

|  | 2019 | 2020 |
|---|---|---|
| Administrative | $16,962 (2.1% of stipulated EGI) | $23,643 (2.8% of stipulated EGI) |
| Management Fees | $29,991(3.75% of stipulated EGI) | $31,618 (3.82% of stipulated EGI) |
| Advertising | $1,892 (0.2% of stipulated EGI) | $3,552 (0.4% of stipulated EGI) |
| Salaries & Benefits[10] | $63,067 (7.9% of stipulated EGI) | $73,905 (8.9% of stipulated EGI) |
| Total | $111,912 (14% of stipulated EGI) | $132,718 (16% of stipulated EGI) |

The Borough's appraiser deemed 5% of EGI as the appropriate rate for "management and administration fee" since it was typical for the Subject's size and type. He provided 2% for additional miscellaneous costs such as "payroll taxes, legal, accounting, supplies etc." He noted that the salaries/benefits package appeared excessive when compared to IREM data, and that his 2% allowance was for any payments to the Superintendent apart from the rent-free unit, that the Superintendent performs certain repairs in exchange for the rent-free accommodation, and that

---

[10] Office salaries were $11,159 for tax year 2019 and $14,435 for tax year 2020. Maintenance salaries were $35,856 for tax year 2019 and $38,489 for tax year 2020. Commissions were $2,425 and $2,238, and benefits were $7,891 and $7,991 for each tax year 2019 and 2020.

lack of a rent-free unit would result in an increased salary allowance. He also stated that there are no commissions for apartment rentals.

The IREM data fee for "garden type buildings" in Southern New Jersey had a category for "Subtotal Administrative" which comprised of management fee and "other administrative." It is unknown what is comprised in the latter. The median (ratio of expense to "gross possible income" which included provision for vacancy and collection loss, thus, effectively, EGI) was as follows:

|  | 2016 data | 2018 data | 2019 data |
| --- | --- | --- | --- |
| Management Fee | 4.2% | 3.5% | 2.8% |
| Other Administrative | 5.5% | 5.8% | 5.4% |
| Subtotal Administrative | 7.7% | 7.9% | 7.7% |

Management fees normally reflect time remuneration for time spent on "accounting, rent collection, advertising and supervision relative to the operation of a rental property, whether performed by an owner or a professional management firm." Murnick v. City of Asbury Park, 2 N.J. Tax 168, 183 (1981) (citation omitted), rev'd on other grounds, 187 N.J. Super. 455 (App. Div. 1982). This is an expense item independent of salaries "actually paid to employees necessary to maintain the property and provide the operational activities necessary to keep a multitenanted apartment . . . physically, functionally, and economically competitive." Ibid. (citation omitted).

Here, the management fee is paid to a related entity and is for activities which are also claimed as being performed by the part-time employee. Further, the salaries paid to this employee was an administrative allocation by the "umbrella" partnership amongst various related entities including plaintiffs, per plaintiffs' representative's testimony, thus, raises the question of it being a reasonable, actual expense. Also, office expenses claimed under "administrative" also appears duplicative since it would be subsumed in the management fee. The Borough's appraiser's testimony as to commissions was also credible, and since there was no information as to the nature and necessity for this item as a landlord expense.

11

Considering all these facts, the court finds that office salaries should be removed from salaries and benefits, as should commissions. Further, due to the duplication of items in "administrative" and management fee, a stabilized provision of 3% of EGI is appropriate for management/administrative/miscellaneous fees for each tax year. This amounts to $23,076 (tax year 2017); $23,996 (tax year 2019); and $24,828 (tax year 2020).

The court accepts the *remainder* of the reported amounts for salaries/benefits tax years 2019 and 2020. While it is unclear whether a portion of the "benefits" are attributable to the part-time employee whose salary is allocated administratively, there is no information to support a quantified reduction of this item. There is no information on the amounts expensed for salaries and benefits for tax year 2017. The court will use 6% of EGI in this regard based on the salaries and benefits (not including office salaries and commissions) for tax year 2019 and 2020 ($49,483 and $57,232) which as a percentage of the stipulated EGI is 6.1% and 6.9% (for tax year 2020, the salary increase was due to a new Superintendent). At 6% of EGI, salary/benefit expense for tax year 2017 will be $46,152.

*(iv) Reserves*

The appraisers differed significantly in this aspect. Plaintiffs' appraiser's total for reserves for short-lived items was $32,903 for each tax year, which as a ratio of EGI is about 4.3%, 4.1%, and 3.9% per tax year. He provided 5% of EGI for long-life (structural) items. Together, they totaled $71,363, $72,897, and $74,283 (using the court decided EGI for 2017 and stipulated EGI for 2019 and 2020 tax years). As a percentage of the EGI, this is 9.28%, 9.11%, and 8.96%, and on a per-unit basis, it is $1,298, $1,325, and $1,350 per tax year.

12

The Borough's appraiser allowed 1.5% of the EGI for reserves, or $11,538; $11,998 and $12,414 respectively (using the stipulated EGI for 2019 and 2020 tax years). On a per-unit basis this is $210; $218; and $226 per tax year.

Plaintiffs' appraiser's reserves for short-lived items were as follows: kitchen replacement (plus cabinets/counters/appliances) and bathroom replacement (including fixtures) were $14,641 and $10,318 respectively for each tax year.[11] For hot water heaters, he used the cost estimate of $500 provided by the plaintiffs' ownership, which was lower than the adjusted cost from M&S ($944), and he used an average life of five years for reserves of $5,500 each tax year. Cost of one A/C unit was estimated at $200 (based on "local sources" and experience). With an estimated 9-year life, reserves were $2,444 each tax year ($200 × 110 units since each unit had two A/C units ÷ 9 years). For long-lived structural items (furnaces, roof, exterior roof, doors, and windows), he noted that his estimate was conservative.[12] A spread sheet in his report showed several items as to which replacements were effectuated by plaintiffs, with the dates when the work was done in 2018/2019, and the apartment number to which it was done (but no costs were included).

---

[11] The Marshall & Swift (M&S) data for "low cost" kitchen replacement (which included appliances, cabinets, countertops) was of $3,375. The appraiser adjusted this for cost and location by 1.02 and 1.16 respectively for a final cost of $3,993. This he multiplied by 55 units, then divided the product by a kitchen's average life of 15 years. The appraiser noted that plaintiffs' ownership indicated that average costs for a new kitchen was about $5,000.

The M&S data for "low cost plumbing fixture" was $785. As adjusted for cost and location (1.03 and 1.16), a three-fixture bathroom cost $2,814. $2,814 x 55 ÷ 15 years estimated life = $10,318 for reserves for each tax year. The appraiser noted that plaintiffs' ownership indicated that average costs for a new kitchen was about $3,000.

[12] Plaintiffs' appraiser noted that the actual capital expenditures in 2018 included concrete work ($34,000); drainage work ($30,000); fencing ($8,235); paving ($82,750); exterior lighting ($16,000); retaining wall ($59,260); tree work ($10,000). Roof replacement in 2020, on two buildings cost $250,000, and the other six buildings required roof replacement at an estimated cost of $750,000. He noted that the total of these capital expenditures based on a 20-year life would require $62,000 annual reserves, which was 160 times his 5% provision. This ratio is unclear since he provided $37,000 to $41,000 as reserves for structural items for each tax year.

The Borough's appraiser's allowance was for future replacement of structural, mechanical, or utility items (roof, furnace, hot water heater, windows). He opined that no one replaces kitchens or bathrooms annually, and that their repairs/renovations would be categorized as repairs and maintenance for valuation purposes even if capitalized for accounting purposes. This is because, he testified, a landlord will prefer to make repairs as opposed to wholesale replacement annually and thus maximize income.

Reserves for replacement "provides for the periodic replacement of building components that wear out more rapidly than the building itself and must be replaced during the building's economic life." Appraisal Institute, The Appraisal of Real Estate, 485 (14th ed. 2013). While the items comprising the reserves "is a matter of appraisal judgment based on market evidence," the "magnitude and coverage of the replacement allowance is based on the annual [R&M] expenses of the property for the specific components considered in the allowance." Id. at 486.

The court finds the Borough's appraiser's provision unduly low. Plaintiff 2's I&E statements for 2019 and 2020 tax years show that the repairs to several components of the units and the Subject, including roof and boiler, and supplies for the repairs, total to about $30,000 (2019 tax year) and $20,000 (2020 tax year), which is about 3.75% and 2.4% of each tax year's EGI. Plaintiffs' appraiser's provision for short-lived items at $32,903 as a ratio of EGI averages about 4%. While the Borough's appraiser is reasonable in noting that no one replaces kitchens or bathrooms every year, here, plaintiff's appraiser deemed their average estimated life as 15 years (which estimate was unchallenged), thus, replacement costs were spread over a 15-year period. Taking the amount spent on repairs into consideration and factoring in the Subject's chronological age (40-50 years), the court finds appropriate, a stabilized allowance 5% of EGI or $38,460; $39,995; $41,380 for each respective tax year.

14

*(3) Cap Rates*

The appraisers differed by less than a percent in their cap rates, thus in their OAR (cap rate plus the stipulated tax rates). Plaintiffs' appraiser's concluded cap rates were 6.5% (tax years 2017 and 2019) and 6.25% (tax year 2020). The Borough's appraiser concluded a cap rate of 5.95%; 5.69%; and 5.54% for each respective tax year at issue.

Plaintiffs' appraiser's cap rates were based on a reconciled approach. He used cap rates from third quarter data issued by the American Council of Life Insurance (ACLI) (for both property type, and geographically, MidAtlantic region), and "equalization" cap rates from Korpacz Real Estate Investor Survey (PWC) (for institutional and non-institutional grade property). He also computed cap rates using the band of investment (BOI) method. For tax year 2017, the ACLI and PWC cap rates ranged from 4.73% to 6.72%. Under the BOI method, he assumed a mortgage of 58%, interest rate of 3.68%, and it appears that he assumed a 5.99% equity rate of return. This provided a cap rate of 6.61%. He concluded a cap rate of 6.5%.

For tax year 2019, the ACLI and PWC cap rates ranged from 4.40% to 6.54%. Under the BOI method, he assumed a mortgage of 58%, interest rate of 4.43%, and it appears that he assumed a 5.97% equity rate of return. This provided for a cap rate of 6.88%. He concluded a cap rate of 6.5%.

For tax year 2020, the ACLI and PWC cap rates ranged from 4.76% to 5.10%. Under the BOI method, he assumed a mortgage of 60%, interest rate of 3.78%, and it appears that he assumed a 5.1% equity rate of return. This provided a cap rate of 6.31%. He concluded 6.25%.

The Borough's appraiser used only the BOI method, and estimated mortgage (LTV) and equity rates of return based on conversations with multiple banks, investors, and on his own

15

investment properties. For tax year 2017, he assumed the availability of a 70% mortgage for a twenty-year period at a 4.5% interest rate, and 5% equity dividend return for a cap rate of 5.95%.

For tax year 2019, he assumed the availability of a 70% mortgage for a twenty-year period at a 4.25% interest rate, and 4.5% equity return rate for a cap rate of 5.69%.

For tax year 2020, he assumed the availability of a 70% mortgage for a twenty-year period at a 4.25% interest rate, and 4% equity return rate for a cap rate of 5.54%.

The court finds the Borough's expert's BOI-based cap rate conclusions more persuasive. The expert confirmed with bankers as to the mortgage terms and interest rates for the market. His substantiation for a lower equity dividend return rate is reasonable. The Subject is a sound investment property, with strong income potential and desirability given its excellent location, and its high occupancy. These facts make it a lesser investment risk, and therefore, does not warrant very high rates of return. Although national, the ACLI survey covers debt-equity transactions, and thus, is more properly applicable as a check on the results from a BOI analysis.

Since the Subject is an apartment complex, the Cap rate should be loaded by the effective tax rate. Prior to the commencement of the trial, the court directed the parties to discuss the tax rates due to the then pending litigation (in another matter) as to the applicability of Chapter 123 to value conclusions in appeals involving real properties in Monmouth County (because, per the taxing district, each year's assessment is a district-wide reassessment, therefore, excepted from the relief under Chapter 123). Parties then provided the court a stipulation of tax rates for each tax year. These rates are the general tax rates, not the effective tax rates.[13] Therefore, the court finds plaintiffs have waived any right to the use of the effective tax rate, and by implication, the relief if any, afforded by application of Chapter 123.

---

[13] See https://www.state.nj.us/treasury/taxation/lpt/taxrate.shtml (last visited June 17, 2021).

16

As noted above, the stipulated tax rates were $2.712; $2.650; and $2.662 for each tax year 2017, 2019 and 2020 respectively.  Therefore, the court finds the OAR as 8.66%; 8.34%; and 8.20%.

**COURT'S VALUE CONCLUSIONS**

*Tax Year 2017*

| | | |
|---|---|---|
| EGI | | $769,200 |
| Less: | | |
| Operating Expenses | | |
| Insurance | $22,000 | |
| Utilities | $49,500 | |
| R&M (9% of EGI) | $69,228 | |
| Management/Admin./Misc. (3% of EGI) | $23,076 | |
| Salaries (6% of EGI) | $46,152 | |
| Subtotal | $209,956 | |
| Reserves (5% of EGI) | $ 38,460 | |
| Total | $248,416 | |
| Net Operating Income | | $520,784 |
| | | |
| OAR at 8.66% | | |
| Value | | $6,013,672 |
| Rounded to | | $6,013,700 |

In connection with the above value conclusion, the court addresses the Subject's 2017 purchase by Plaintiff 2.  The Borough claims the sale was exposed to the market by a third-party realtor and sold at an arms-length price.  Plaintiffs' officer and their appraiser argued that the transactions were undertaken to save federal capital gains tax of about $1,414,500, which savings were used towards the purchase price of the Subject, therefore, the Subject's purchase price is inflated by that amount, and the loan-to-value ratio exceeds 90% ($6,225,000 non-recourse loan versus $6,885,500, the alleged actual sale price), which is evidence of the non-arms-length nature of the Subject's purchase.

Depending on the facts, an alleged I.R.C. §1031 exchange sale may be deemed a credible value indicator (as a comparable or as a subject sale).  See e.g. Aetna Life Ins. Co. v. Montgomery

17

County Bd. of Assessment Appeals, 113 A.3d 267, 283 (Pa. Cmmw. Ct. 2015) ("a 1031 Exchange, a sale-leaseback agreement, and an option-to-purchase agreement - are competent comparables as a matter of law and may be used to determine the Property's market value, so long as these sales are found to be 'bona fide' or 'fair.'"); Inland Edinburgh Festival, LLC v. Cty. of Hennepin, 938 N.W.2d 821, 827-828 (Minn. 2020) (property sold as an I.R.C. §1031 exchange "may not represent the property's fair market value because when business or investment property owners conduct a section 1031 exchange, any property that is of the same nature or character may be traded, even if the properties differ in grade or quality" however, "[i]t may well be that the sale price from a section 1031 property exchange is indicative of the market value for the property at issue") (citations omitted).

Here, while the court is skeptical of plaintiffs' appraiser's opinion that the tax savings on the deferral of the gain/loss was used to purchase the Subject, it need not decide whether the Subject 2017 sale is a credible value indicator. The Borough's appraiser did not rely on the Subject's sale. Rather, he developed a value under the income approach, which approach the court finds appropriate. Therefore, analyzing whether the 2017 Subject's sale was a non-arms-length "reverse" I.R.C. §1031 transaction is academic.

*Tax Year 2019*

| | | |
|---|---|---|
| EGI | | $799,880 |
| Less: | | |
| Operating Expenses | | |
| Insurance | $24,087 | |
| Utilities | $50,704 | |
| R&M (9% of EGI) | $71,989 | |
| Management/Admin./Misc. (3% of EGI) | $23,996 | |
| Salaries | $49,483 | |
| Subtotal | $220,260 | |
| Reserves (5% of EGI) | $ 39,995 | |
| Total | $260,254 | |
| Net Operating Income | | $539,626 |

OAR at 8.34%
Value                                                                $6,470,335
Rounded to                                                           $6,470,300


*Tax Year 2020*

EGI                                                                  $827,604
Less:
    Operating Expenses
        Insurance                              $28,273
        Utilities                              $51,471
        R&M (9% of EGI)                        $74,484
        Management/Admin./Misc. (3% of EGI)    $24,828
        Salaries                               $57,232
        Subtotal                                           $236,288
Less:  Reserves (5% of EGI)                                 $  41,380
        Total                                              $277,669
        Net Operating Income                               $549,935

OAR at 8.20%
Value                                                                $6,706,524
Rounded to                                                           $6,706,500[14]

**CONCLUSION**

The court will enter judgments revising the assessments for tax year 2017, 2019 and 2020

in accordance with this opinion.

                              /s/ Mala Sundar
                              Hon. Mala Sundar, P.J.T.C.

---

[14] For tax year 2020, plaintiffs' appraiser deducted $50,000 from his ultimate value conclusion, this being the amount allegedly expended by the landlord to gut and waterproof unit 55 in 2019. The court disagrees. As with his stabilization of the 2019 extraordinary expenses for exterminator, he should also have stabilized this expense item.