**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

February 10, 2025

Michael I. Schneck, Esq.
Schneck Law Group, LLC
23 Vreeland Road, Suite 270
Florham Park, New Jersey 07932

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue, Suite 310 N
Lyndhurst, New Jersey 07071

> Re:     42 Broadway LLC v. Paterson City
>         Docket Nos. 000062-2023 and 000063-2023

Dear Mr. Schneck and Mr. Turner:

This letter constitutes the court's opinion following trial of plaintiff, 42 Broadway LLC's ("plaintiff") challenge to the 2021 and 2022 tax years added/omitted assessments on plaintiff's improved property in the City of Paterson ("Paterson").

For the reasons stated below, the court reduces the 2021 and 2022 tax years added/omitted assessments as set forth herein.

## I.     Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered during trial.

Plaintiff is the owner of the real property and improvements located at 40-42 Broadway, Paterson, New Jersey. The property is located on Broadway near the intersection of West Broadway and Main Street in Paterson's B-4, Central Business zoning district, approximately 3






blocks from Market Street and Paterson's Center City Commercial Business District. The property is identified on Paterson's municipal tax map as block 4503, lot 8 (the "subject property").

Plaintiff timely filed complaints challenging the 2021 and 2022 tax years prorated added/omitted assessments imposed on the subject property. During trial plaintiff offered testimony from a New Jersey certified general real estate appraiser, who was accepted by the court as an expert in the real property valuation field ("plaintiff's expert" or "expert").[1] The expert prepared an appraisal report expressing his opinions regarding the subject property's true or fair market value as of each valuation date. Paterson did not offer any fact or expert witness testimony.

As of each valuation date the subject property's added/omitted tax assessments, the pro-rated added/omitted assessment period, the implied equalized value of the added/omitted assessments, and the expert's value conclusions are set forth below:

| Valuation date | Added/omitted tax assessment | Prorated added/omitted assessment period | Average ratio of assessed to true value | Equalized value of added/omitted assessment | Expert's valuation (including land) |
|---|---|---|---|---|---|
| 10/1/2020 | $3,376,900 | 12 months | 76.25% | $4,428,721 | $1,925,000 |
| 10/1/2021 | $3,376,900 | 12 months | 67.98% | $4,967.490 | $2,070,000 |

The subject property consists of an 0.1119-acre lot and is improved with a brick 23,100 square foot five-story mixed-use building constructed in or about 1930. The ground floor of the building comprises approximately 3,750 square feet of retail space, and floors two through five comprise sixteen (16) apartments units containing approximately 19,350 square feet.

The subject property consists of eight (8) one-bedroom apartments, and eight (8) two-bedroom apartments. Each apartment is separately metered for electric and gas and contains a

---

[1] Paterson stipulated to the qualifications of plaintiff's appraiser as an expert in the real property valuation field.





separate forced air HVAC system (for heat and central air conditioning) and hot water heater. The tenants are responsible for their own electric charges, gas charges, and hot water. Plaintiff is responsible for furnishing cold water, and common area heat and electricity.

The expert's appraisal report contains exterior and interior photographs of the subject property, including photographs of two representative apartments.[2] The photographs reveal that the subject property's lobby features exposed brick walls, a stone or stamped concrete floor, overhead industrial styled lighting, built-in metal cluster mailboxes, a stainless-steel passenger elevator, and an open stairwell. Each apartment is finished with hardwood flooring in the living areas and bedrooms, and ceramic tiling in the kitchen, bathrooms, and utility rooms. Each kitchen is nicely appointed with clear finished oak upper and lower cabinetry, Formica countertops, a range/oven, a refrigerator/freezer and a stainless-steel sink. The bathrooms feature three fixtures, a single sink vanity, a toilet, and a shower/tub.

Between 2014 to 2015 the subject property was extensively renovated. The expert's interior and exterior photos confirm such renovation. The expert characterized the subject property as being in "average condition." However, based on the court's review of the exterior and interior photos, the subject property is in above average condition.

The subject property is in Paterson's B-4 "Central Business" zoning district with permitted uses that include mixed-use retail and multi-family apartment structures. Thus, operation of the subject property as a mixed-use retail and multi-family apartment building is a legally conforming use.[3]

---

[2] The expert did not gain access to the retail unit thus, his appraisal report contained no interior photographs of that unit. Moreover, he possessed little knowledge regarding its condition or use.
[3] In the expert's opinion, the use of the subject property's retail unit as "The Universal Church," is a permitted commercial use.






The subject property is in Special Flood Hazard Area zone AO, denoting an area having a 1-percent annual chance of flooding.[4]

## II. Conclusions of Law

### A. Presumption of validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence

---

[4] https://www.fema.gov/about/glossary/flood-zones.






of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessments has overcome the presumption of validity. If the court concludes that the challenging party has not carried its burden, then dismissal of the action is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording plaintiff all reasonable inferences that could be deduced from the evidence presented, the court finds that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. The expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's added/omitted tax assessments.

B. Highest and best use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically






possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, the expert opined, and the court agrees, that the highest and best use of the subject property, as vacant and as improved, is as a mixed-use retail and multi-family apartment building.

### C. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

#### 1. Income capitalization approach

When a property is income-producing, the income capitalization approach is the favored






method for determining the estimated value of that property. Parkway Vill. Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).

The income capitalization approach is,

> based on the principle of anticipation, which states that value is created by the expectation of benefits to be derived in the future. In other words, the value of an apartment property reflects what a prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period.
>
> [Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd ed. 2008).]

Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Here, the court concludes, as did the expert, that the income capitalization approach is the most appropriate method to derive the estimated true or market value for the subject property.






   a. Market or economic rent and potential gross income

The first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, at 97. Forecasting a property's gross rental income requires an expert to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments, 108 N.J. at 270.

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). Notably, the market rent ascribed to a property may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

   1. Apartment units

Absent contrary convincing evidence, the actual rents paid in a well-managed apartment complex are clear evidence of economic rent. G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982). In Parkview Vill. Assocs. our Supreme Court explained that:

> [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project . . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court . . . should be most hesitant to find that the tenants of a






residential property being operated commercially are being charged inadequate rent.

[Parkview Vill. Assocs., 62 N.J. at 34.]

Hence, when an apartment complex is being commercially operated and is well-managed, the court shall accord the taxpayer a presumption that the actual rent collected, as of the assessing date, is equivalent to the economic rent. Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985). When the "gross rental value of the property on the respective assessing dates . . . [is] based on the actual rent rolls and . . . no convincing testimony [was presented] that the management was not charging market rent," that is the most trustworthy evidence of income. Jefferson House Investment Co. v. Chatham, 4 N.J. Tax 669, 676-77 (1982). "An analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984) (emphasis in original). Accordingly, when available, the "actual rent roll" of a property as of the "critical assessing date" is fundamental to determining the true value of a property. Glen Wall Assocs., 99 N.J. at 274.

However, a taxing district may overcome this presumption by presenting "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long[-]term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Vill. Apartments Co., 108 N.J. at 272; see also Glen Wall Assocs., 99 N.J. at 276; Equitable Life Assur. Soc. of US v. Secaucus Town, 16 N.J. Tax 463, 466-67 (App. Div. 1996); G & S Co. v. Eatontown, 2 N.J. Tax at 94.

Here, plaintiff's expert testified that in determining the economic or market rent, he examined the subject property's rent rolls and reviewed them against comparable properties in the






Paterson market. According to plaintiff's expert, the subject property's rent roll, as of the October 1, 2020 valuation date, reported rents of: (i) $1,030 to $1,160 per month, for the one-bedroom apartments; and (ii) $1,290 to $1,500 per month, for the two-bedroom apartments, which the expert found to be reasonable in the marketplace. In addition, the subject property's rent roll, as of the October 1, 2021 valuation date, reported rents of: (i) $1,054 to $1,200 per month, for the one-bedroom apartments; and (ii) $1,330 to $1,550 per month, for the two-bedroom apartments, which the expert also found reasonable in the marketplace. Moreover, during trial, the expert credibly testified that plaintiff has its "own management team" and "is a sophisticated real estate owner, that is absolutely [a] competent property manager."

Paterson offered no evidence contradicting these statements. Additionally, the court emphasizes that Paterson presented no evidence that: (i) the property is not well managed, (ii) the leases are old, long-term leases, or (iii) based on an analysis of four comparable apartment properties, the leases are not economic. See Parkway Vill. Apartments Co., 108 N.J. at 272.

Therefore, for the above stated reasons, the court finds that the subject property's apartment rents, reported on the October 1, 2020 and October 1, 2021 rent rolls, were credible evidence of economic or market rent.

Accordingly, the annualized rent roll and thus, the subject property's potential gross income from the sixteen (16) apartment units was: (i) $239,220, as of October 1, 2020 valuation date ($19,935 rent roll x 12 months = $239,220); and (ii) $245,808, as of the October 1, 2021 valuation date ($20,484 rent roll x 12 months = $245,808).

2. Retail unit

To determine the economic or market rent of the subject property's retail unit, the expert identified five (5) retail leases that he opined were comparable with the subject property. The five






retail leases were identified as follows:

| Lease | Address | Lease date | Leased area | Rent PSF | Lease type |
|-------|---------|-----------|-------------|----------|------------|
| 1 | 554 River Street Paterson, NJ | February 2020 | 900 sq. ft. | $16.00 | Modified gross |
| 2 | 375-385 McLean Blvd. Paterson, NJ | June 2020 | 1,875 sq. ft. | $22.50 | Modified gross |
| 3 | 162-164 W. Broadway Paterson, NJ | September 2020 | 650 sq. ft. | $22.15 | Modified gross |
| 4 | 209 McBride Ave. Paterson, NJ | February 2021 | 725 sq. ft. | $17.38 | Modified gross |
| 5 | 919-921 Main Street Paterson, NJ | May 2021 | 1,000 sq. ft. | $24.00 | Modified gross |

Plaintiff's expert testified that, except for comparable lease 3, he confirmed the lease details with the listing agent/realtor or a leasing representative. Plaintiff's expert applied no adjustments to any of the comparable leases. In his opinion, he could not find any market data that would support adjustments for time, location, size, or condition.

The expert relied on all five (5) leases to determine his economic or market rent as of the October 1, 2020 and October 1, 2021 valuation dates. Thus, the range of rents, as of the October 1, 2020 and October 1, 2021 valuation dates were $16.00 to $24.00 per square foot. Plaintiff's expert concluded a market or economic rent of: (i) $21.00 per square foot, as of the October 1, 2020 valuation date; and (ii) $21.50 per square foot, as of the October 1, 2021 valuation date.

At the outset, the court must reject plaintiff's expert's comparable lease 3. Plaintiff's expert did not possess a copy of the lease, did not review the lease, and was unable to verify the terms of the lease, including its inception date, leased area, lease terms, period of free rent, or rental value with the landlord, the landlord's attorney, the tenant, the tenant's attorney, or any brokers involved in the transaction. Plaintiff's expert relied solely on data reported by the Garden State MLS, which expressly cautions "Info. deemed reliable but not guaranteed." Thus, the court finds comparable






lease 3 to be unreliable and not credible evidence of market or economic rent. See VBV Realty LLC v. Scoth Plains Twp., 29 N.J. Tax 548, 565 (Tax 2017).

Importantly, the court's review of the remaining four (4) comparable leases discloses that none of the comparable leases are in Paterson's B-4 Central Business zoning district nor in proximity to Paterson's Center City Commercial Business District. Thus, the court has concerns as to the similarity, competitiveness in the marketplace, and comparability of the remaining four comparable retail leases to the subject property.

The court finds that the greatest weight must be attributed to comparable lease 2 and comparable lease 5, as those comparable leases are physically and functionally most akin to the subject property's retail location. Comparable lease 2 is in a small strip-retail center located along McLean Boulevard/State Highway Route 20, a well-traveled roadway, and in a highly visible location. Comparable lease 5 is located along Main Street at the intersection of Robert Street. Comparable lease 5 is in a vibrant mixed-use retail and residential area of Paterson, like the subject property. Moreover, comparable lease 5 contains ground floor retail units, and apartment units above the retail stores, like the subject property.

Accordingly, for the foregoing reasons, attributing the greatest weight to comparable lease 2 and comparable lease 5, the court finds that the economic or market rent that should be ascribed to the subject property's retail unit, as of the October 1, 2020 valuation date should be $23.00 per square foot, and as of the October 1, 2021 valuation date should be $23.75 per square foot.

Therefore, the court finds that the subject property's potential gross income is: (i) $325,470, as of the October 1, 2020 valuation date (3,750 sq. ft x $23.00 PSF = $86,250 + $239,220 = $325,470); and (ii) $334,871, as of the October 1, 2021 valuation date (3,750 sq. ft x $23.75 PSF = $89,063 + $245,808 = $334,871).






b.     Vacancy and collection loss

Vacancy and collection losses are "usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate 478 (14th ed. 2013).

Plaintiff's expert applied a vacancy and collection loss factor of five (5%) percent to the subject property's reconstructed potential gross income. Plaintiff's expert reviewed the subject property's rent rolls and consulted CoStar reports for vacancy rates of apartments and retail buildings in: Passaic County; Passaic County 2 star rated buildings, the Downtown Paterson submarket, and the Downtown Paterson submarket 2 star rated buildings. The expert's analysis of those reports disclosed vacancy rates of between 0.49% to 2.72% for apartments, and 2.08% to 5.10% for retail buildings. Accordingly, the expert concluded that a vacancy and collection loss factor of five (5%) percent was reasonable for the marketplace.

The court finds plaintiff's expert's vacancy and collection loss factor is adequately supported in the trial record with evidence derived from market-based data. Therefore, the court accepts the expert's conclusion and will apply a vacancy and collection loss factor of five (5%) percent of potential gross income to the subject property's reconstructed operating statement for the 2021 and 2022 tax years.

c.     Operating expenses

The next step under the income capitalization approach is determination of the appropriate stabilized operating expenses. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent






and competent management." The Appraisal of Real Estate, at 479.

When the actual operating expenses of a well-managed apartment complex are 'within normal operating limits,' they should be accepted and deemed representative of the marketplace. Parkway Vill. Apartments Co., 8 N.J. Tax at 441-42. Conversely, when the evidence discloses that a property's economic rents are market derived, but the actual expenses are outside of acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Twp. of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). That is not to say that every operating expense must be accepted, adjusted, or stabilized in its entirety. An appraiser may elect to accept those operating expenses that are reasonable and typical of industry norms, and reject those that are irregular, uncharacteristic, and anomalous. The use of "both actual and stabilized expenses is acceptable appraisal practice." Maple Court Associates Ltd. v. Ridgefield Park Twp., 7 N.J. Tax 135, 153 (Tax 1984); See also Rudd v. Cranford Twp., 4 N.J. Tax 236, 244 (Tax. 1982); Skytop Gardens Inc. v. Sayreville Bor., 3 N.J. Tax 187, 194-96 (Tax 1981).

Here, plaintiff's expert testified that he reviewed the subject property's actual operating expenses for the 2019, 2020, and 2021 tax years. To gauge the reasonableness of the subject property's expenses, the expert compared the subject property's reported expenses to the operating expenses of three other mixed-use properties. The three comparable properties identified by the expert were in Jersey City (Hudson County), Belleville (Essex County), and Palisades Park (Bergen County). The three properties possessed between 16 to 36 apartments and had retail space ranging from 2,738 to 13,100 square feet.

Plaintiff's expert's comparison of the subject property's expenses with the expenses of the three other properties revealed the following:

   

| Expense category | Subject property | Comparable 1 | Comparable 2 | Comparable 3 |
|---|---|---|---|---|
| Management (% of EGI) | 0.00% | 4.73% | 5.75% | 0.00% |
| Admin. (% of EGI) | 8.29% | 5.59% | 9.99% | 2.14% |
| Utilities (% of EGI) | 3.46% | 12.11% | 10.25% | 8.21% |
| Maintenance (% of EGI) | 17.04% | 9.08% | 13.73% | 11.26% |
| Insurance (% of EGI) | 7.23% | 7.07% | 3.77% | 3.29% |
| Sanitation (% of EGI) | 0.00% | 0.00% | 0.00% | 1.36% |
| Security (% of EGI) | 0.00% | 0.00% | 0.00% | 0.00% |
| Misc. (% of EGI) | 0.00% | 0.00% | 0.08% | 0.00% |
| Reserves (% of EGI) | 0.00% | 0.00% | 0.00% | 0.00% |
| Leasing Commission (% of EGI) | 0.70% | 0.00% | 0.38% | 8.09% |

In the expert's opinion, the following stabilized expenses should be deducted from the subject property's reconstructed effective gross income: (a) a management fee of 5%; (b) an administration expense of 5%; (c) utility expenses of 3.5%; (d) maintenance and repair expenses of 10%; (e) insurance expenses of 7.2%; (f) miscellaneous expenses of 1%; (g) reserves for replacements of 2%; and (h) leasing commissions of 5% of the gross income attributable to the retail portion of the subject property.

The court finds the following stabilized expenses, as concluded by the expert, to be reasonable and supported by the evidence: (i) a 5% management expense; (ii) a 3.5% utility expense; (iii) a 10% maintenance and repair expense; (iii) a 7.2% insurance expense; (iv) a 2% replacement reserve; and (v) a 5% leasing commission expense of the gross income attributable to the retail portion of the subject property. However, the court must reject the expert's proffered stabilized administration expense and miscellaneous expense.

At the outset, the court emphasizes that of the three comparable expense properties relied upon by the expert, expense comparable 1 had approximately 350% more retail area than the subject property (13,100 square feet versus 3,750 square feet). Moreover, expense comparable 2 and expense comparable 3 had between 213% to 225% more apartments than the subject property






(36 units and 34 units versus 16 units). Thus, the court finds that the expert's three expense comparable properties may not necessarily accurately represent the stabilized expenses associated with operating the subject property.

The court's review of the actual incurred administration and miscellaneous expenses of the subject property, along with those of the three comparable properties discloses a range of total administration and miscellaneous expenses from 2.14% to 10.07% of effective gross income. Moreover, the subject property's reported administration and miscellaneous expenses of 8.29% is 2.7% higher than comparable expense property 1 (5.59%) and 6.15% higher than comparable expense property 3 (2.14%). The expert offered no meaningful testimony to explain the disparity between the subject property's administration and miscellaneous expenses and those two comparable properties. Moreover, the expert offered no testimony that there is an on-site superintendent or full-time maintenance person for the subject property that would result in increased administration expenses. The court finds the subject property is more closely aligned with expense comparable 3. Accordingly, the court finds the subject property's administration and miscellaneous expenses are outside normal limits. Instead, the court will apply a stabilized administration and miscellaneous expense of two and one-half (2.5%) percent of effective gross income to the subject property's reconstructed operating statement.

### d. Capitalization

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of true or market value.

   

Here, in deriving his capitalization rates, plaintiff's expert consulted investor surveys, personally available data, and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given periods of time. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. This court has "sanctioned" the use of data collected and commercially published by analytical firms and trade associations, such as Real Estate Research Corporation ("RERC"), American Council of Life Insurance ("ACLI"), and PwC. By scrutinizing and "analyzing this data, in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Hull Junction Holding, 16 N.J. Tax. at 83.

The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Id. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. at 279-80).

Here, to discern his capitalization rate, the expert employed the Band of Investment technique and reviewed the following: (i) PwC National Strip Shopping Center Market survey data for the 3rd quarter 2020 and 3rd quarter 2021; (ii) PwC National Apartment Market survey data for the 3rd quarter 2020 and 3rd quarter 2021; (iii) PwC Regional Apartment Markets survey data for the 3rd quarter 2020 and 3rd quarter 2021; (iv) RERC Regional Investment Criteria, Second-Tier






Investment Properties data for the 3rd quarter 2020 and 3rd quarter 2021; (v) RERC Regional Investment Criteria, Third-Tier Investment Properties data for the 3rd quarter 2020 and 3rd quarter 2021; (vi) ACLI Retail Investment Bulletins for 3rd quarter 2020 and 3rd quarter 2021; (vii) ACLI Apartment Investment Bulletins for the 3rd quarter 2020 and 3rd quarter 2021; and (viii) United States Treasury rates for a 5-year, 7-year, 10-year, 20-year, and 30-year term. In addition, plaintiff's expert testified that he is on the advisory board of a local bank and that he regularly engages in discussions with his uncle who is a loan officer. Plaintiff's expert also testified that he reviewed data on three commercial loans in Paterson that were reported on CoStar. However, the court emphasizes that no data or information about those loans or the properties on which those loans were made were contained in the expert's appraisal report or the addendum thereto.

In performing his Bank of Investment technique, plaintiff's expert concluded the following capitalization rates:

(i)     6.80% as of the October 1, 2020 valuation date (3.50% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.00% equity dividend rate);

(ii)    6.60% as of the October 1, 2021 valuation date (3.00% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.00% equity dividend rate).

The court's review and analysis of the retail sector data reveals the following reported capitalization rates:

|  | PwC National Strip Shopping Center Market | ACLI Bulletin Retail Buildings | RERC 2nd Tier Properties Retail - East Criteria | RERC 3rd Tier Properties Retail - East Criteria |
|---|---|---|---|---|
| 3rd quarter 2020 | 4.75% - 10%, 6.84% avg. | 2.9% - 7.7% 6% avg. | 7% - 12% 9% avg. | 7.5% - 12.5% 9.7% avg. |
| 3rd quarter 2021 | 5% - 10% 7.29% avg. | 4.2% - 9.3% 6.4% avg. | 7.5% - 11.3% 9% avg. | 7.5% - 11.3% 9.7% avg. |






The court's review and analysis of the apartment sector data reveals the following reported capitalization rates:

| | PwC National Apartment Market | PwC Regional Apartment Markets – Mid-Atlantic Region | ACLI Bulletin Apartment Buildings | RERC 2nd Tier Properties Apartment - East Criteria | RERC 3rd Tier Properties Apartment - East Criteria |
|---|---|---|---|---|---|
| 3rd quarter 2020 | 3.5% - 8% 5.22% avg. | 4% - 6.75% 5.43% avg. | 3.3% - 5.89% 4.77% avg. | 5.5% - 8.5% 7.3% avg. | 6% - 9.5% 7.9% avg. |
| 3rd quarter 2021 | 3% - 7% 4.59% avg. | 4.25% - 6.5% 5.03% avg. | 4.21% - 6.56% 4.99% avg. | 5.5% - 9% 6.9% avg | 6% - 9% 7.7% avg. |

Specifically, the ACLI Bulletin Retail Buildings for the 3rd quarter 2020 reported interest rates in the NJ, NY-NJ-CT-PA, $2 – $4.99 million value, and less than 50,000 square foot size, a range of 2.97% to 3.78%, loan-to-value ratios of 51.87% to 59.33%, and an indicated equity dividend rate of 4.15% to 6.46%. In addition, the ACLI Bulletin Apartment Buildings for the 3rd quarter 2020 reported interest rates in the NJ, NY-NJ-CT-PA, $2 – $4.99 million value, and less than 200-unit size, a range of 2.97% to 3.74%, loan-to-value ratios of 51.41% to 59.33%, and an indicated equity dividend rate of 4.15% to 5.41%.

Finally, the ACLI Bulletin Retail Buildings for the 3rd quarter 2021 reported interest rates in the NJ, NY-NJ-CT-PA, $2 – $4.99 million value, and less than 50,000 square foot size, a range of 2.74% to 3.71%, loan-to-value ratios of 52.24% to 62.52%, and an indicated equity dividend rate of 3.81% to 6.7%. Further, the ACLI Bulletin Apartment Buildings for the 3rd quarter 2021 reported interest rates in the NJ, NY-NJ-CT-PA, $2 – $4.99 million value, and less than 200-unit size, a range of 2.74% to 3.28%, loan-to-value ratios of 49.21% to 63.58%, and an indicated equity dividend rate of 3.81% to 7.19%.

Accordingly, based on the court's review of the above data and information, and in consideration of the expert's testimony, the court finds that as of the October 1, 2020 valuation date, the plaintiff's expert's 60% loan-to-value ratio, twenty-five (25) year amortization period,






and 3.5% interest rate is credible. However, the court does not find the expert's proposed 8% equity dividend rate credible. The ACLI data revealed that, as of the October 1, 2020 valuation date, the equity dividend rates for retail buildings ranged from 4.15% to 6.46%, and for apartment buildings ranged from 4.15% to 5.41%. Therefore, the court finds that a 5.5% equity dividend rate is more reasonable and supported by the market data. Moreover, the PwC National Strip Shopping Center Market reflected a capitalization rate average of 6.84% and the PwC National Apartment Market reflected a capitalization rate average of 5.22%. Thus, the court concludes that a base capitalization rate of 5.80% should be applied to the subject property's reconstructed operating statement as of the October 1, 2020 valuation date.[5]

Further, based on the court's review of the above data and information, and in consideration of the expert's testimony, the court finds that as of the October 1, 2021 valuation date, the plaintiff's expert's 60% loan-to-value ratio, twenty-five (25) year amortization period, and 3% interest rate is credible. However, the court does not find the expert's proposed 8% equity dividend rate credible. The ACLI data revealed that, as of the October 1, 2021 valuation date, the equity dividend rates for retail buildings ranged from 3.81% to 6.7%, and for apartment buildings ranged from 3.81% to 7.19%. Therefore, the court finds that a 5.5% equity dividend rate is more reasonable and supported by the market data. Moreover, the PwC National Strip Shopping Center Market reflected a capitalization rate average of 7.29% and the PwC National Apartment Market reflected a capitalization rate average of 4.59%. Thus, the court concludes that a base capitalization rate of 5.62% should be applied to the subject property's reconstructed operating statement as of the October 1, 2021 valuation date.[6]

---

[5] 6.007% constant x .60 = 3.6042% and 5.5% x .40 = 2.2% (3.6042% + 2.2% = 5.80% rounded).
[6] 5.691% constant x .60 = 3.4146% and 5.5% x .40 = 2.2% (3.4146% + 2.2% = 5.62% rounded).






Accordingly, the subject property's reconstructed operating statements for the 2021 and 2022 tax years are set forth below:

**2021 Tax Year**

INCOME:

| | | |
|---|---|---|
| Apartments | | $239,220 |
| Retail Unit | 3,750 s.f. x. $23.00 P.S.F. | $ 86,250 |
| TOTAL: | POTENTIAL GROSS INCOME | $325,470 |
| LESS: | Vacancy & Collection Loss @ 5% | ($ 16,274) |
| TOTAL: | EFFECTIVE GROSS INCOME | $309,196 |

| STABILIZED EXPENSES: | | |
|---|---|---|
| Management | @ 5% of EGI | $15,460 |
| Administration/Misc. | @ 2.5% of EGI | $ 7,730 |
| Insurance | @ 7.2% of EGI | $22,262 |
| Utilities | @ 3.5% of EGI | $10,822 |
| Repairs/Maintenance | @ 10% of EGI | $30,920 |
| Repl. Reserves | @ 2% of EGI | $ 6,184 |
| Leasing commission | @ 5% of retail EGI | $ 4,313 |
| TOTAL: STABILIZED EXPENSES | | ($97,691) |

| | |
|---|---|
| NET OPERATING INCOME | $211,505 |

| | |
|---|---|
| Base Capitalization Rate | 5.80% |
| Effective Tax Rate | 3.413% |
| Loaded Capitalization Rate | 9.213% |

| | |
|---|---|
| MARKET VALUE | $2,295,723 |


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



**2022 Tax Year**

| | | |
|---|---|---|
| Apartments | | $245,808 |
| Retail Unit | 3,750 s.f. x. $23.75 P.S.F. | $ 89,063 |
| TOTAL: | POTENTIAL GROSS INCOME | $334,871 |
| LESS: | Vacancy & Collection Loss @ 5% | ($ 16,744) |
| TOTAL: | EFFECTIVE GROSS INCOME | $318,127 |

| STABILIZED EXPENSES: | | |
|---|---|---|
| Management | @ 5% of EGI | $ 15,906 |
| Administration/Misc. | @ 2.5% of EGI | $ 7,953 |
| Insurance | @ 7.2% of EGI | $ 22,905 |
| Utilities | @ 3.5% of EGI | $ 11,134 |
| Repairs/Maintenance | @ 10% of EGI | $ 31,813 |
| Repl. Reserves | @ 2% of EGI | $ 6,363 |
| Leasing commission | @ 5% of retail EGI | $ 4,453 |
| TOTAL: STABILIZED EXPENSES | | ($100,527) |

| | |
|---|---|
| NET OPERATING INCOME | $217,600 |

| | |
|---|---|
| Base Capitalization Rate | 5.62% |
| Effective Tax Rate | 3.156% |
| Loaded Capitalization Rate | 8.776% |

| | |
|---|---|
| MARKET VALUE | $2,479,490 |

Therefore, utilizing the income capitalization approach, the court finds the true or fair market value of the subject property, including the land, to be: (i) $2,295,723, as of the October 1, 2020 valuation date; and (ii) $2,479,490, as of the October 1, 2021 valuation date.

  f.  Corrected added/omitted assessment

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the correct added/omitted tax assessment for the 2021 and 2022 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower






limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

For the 2021 tax year, the ratio of the total assessed value, $3,927,000,[7] to true market value, $2,295,723, yields a ratio of 171.06% ($3,927,000/$2,295,723 = 171.06%), which exceeds Paterson's upper limit (87.69%) of the Chapter 123 common level range. Consequently, the subject property's total tax assessment calculation for the 2021 tax year is:

$2,295,723 x .7625 = $1,750,500 [ROUNDED]

Accordingly, a judgment revising the subject property's 2021 tax year added/omitted assessment, prorated for twelve months, will be entered as follows:

Added/omitted assessment = $1,200,400

For the 2022 tax year, the ratio of assessed value, $3,927,000,[8] to true market value, $2,479,490, yields a ratio of 158.39% ($3,927,000/$2,479,490 = 158.39%), which exceeds Paterson's upper limit (78.18%) of the Chapter 123 common level range. Consequently, the subject property's total tax assessment calculation for the 2022 tax year is:

$2,479,490 x .6798 = $1,685,600 [ROUNDED]

Accordingly, a judgment revising the subject property's 2022 tax year added/omitted assessment, prorated for twelve months, will be entered as follows:

Added/omitted assessment = $1,135,500

Contemporaneously with the issuance of this letter opinion, the court shall enter the above-

---

[7] According to the expert, the subject property's 2021 tax year total tax assessment inclusive of land, improvements, and the added/omitted assessment.
[8] According to the expert, the subject property's 2022 tax year total tax assessment inclusive of land, improvements, and the added/omitted assessment.






referenced judgments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




